Wilfred **KEYES**, individually and on behalf of Christi Keyes, a minor, et al., Plaintiffs,

v.

**SCHOOL DISTRICT NUMBER ONE, DENVER, COLORADO, et al.,** Defendants.

Civ. A. No. C–1499.

United States District Court
D. Colorado.

July 31, 1969.

Vacated and Remanded Aug. 5, 1969.

Barnes & Jensen, by Craig S. Barnes, Gerald L. Jensen, Holland & Hart, by Gordon G. Greiner, Lawrence W. Treece, Robert T. Connery, Denver, Colo., Vilma Martinez Singer, New York City, for plaintiffs.

Henry, Cockrell, Quinn & Creighton, by Richard C. Cockrell, Victor Quinn, Thomas E. Creighton, Benjamin L. Craig, Michael Jackson, Denver, Colo., Beirne, Wirthlin & Manley, by Robert E. Manley, Cincinnati, Ohio, for defendants, except John H. Amesse, James D. Voorhees, Jr., and Rachel B. Noel, as individuals.

## MEMORANDUM OPINION AND ORDER

WILLIAM E. DOYLE, District Judge.

### I. JURISDICTION

This is before us on a motion for temporary injunction. Examination of

the complaint reveals that jurisdiction is invoked by reason of Title 28 U.S.C. § 1343(3) (4), which authorizes the Court to entertain suits which seek to redress injuries resulting from violations of the Constitution of the United States. Although the Declaratory Judgment Act has been invoked, this does not of itself confer any independent jurdisdiction. The Civil Rights Act is also drawn into play, Title 42 U.S.C. §§ 1983, 1985. It is alleged that the State of Colorado, acting through its agents, violated plaintiffs' constitutional rights. By reason of the allegations of the complaint and the facts which have been presented, it is determined that there is subject matter jurisdiction to hear the cause.

The plaintiffs, who are school children, allege through their parents that their rights have been violated and continue to be violated through acts that have been described. Consequently, they are aggrieved persons. There is no dispute about their identity or their interest in the case, nor is there any question raised as to the propriety of a class action on behalf of all persons similarly situated. Consequently, there does not appear to be any problem about jurisdiction, personal or subject matter, to entertain the cause. Both sides have conceded that it is a matter that needs immediate attention and that it should be disposed of without delay.

## II. THE ISSUES

The pleadings describe alleged injuries resulting from the plaintiffs having been subjected to unequal treatment with respect to their right to an education. They seek to enjoin the implementation of a resolution of the School Board passed on June 9th of this year which would have rescinded previous resolutions which had made some effort to mitigate or reduce segregation which allegedly had existed in schools in the northeast part of Denver. The defendants deny that there has been any actionable segregation. Although no answer has been filed, they maintain that segregation, if any, exists by reason of maintaining neighborhood schools and natural migration, and that no action on their part has brought this about or intensified it. Basically, this is the issue which has been tried here, and has been tried rather extensively.

The complaint herein contains several causes of action and counts. At this stage of the proceedings we are concerned only with the first cause of action and the counts which are related to it. All of these allegations pertain to the rescission of School Board Resolutions 1520, 1524 and 1531, which resolutions made changes in the attendance areas of certain high schools, junior high schools and elementary schools in northeast Denver, and undertook to desegregate these schools, all of which had become or were becoming predominantly Negro schools. It is alleged that on June 9, 1969, the newly elected School Board, by motion, rescinded all three resolutions. The complaint alleges that the action of the Board was in violation of the plaintiffs' Constitutional rights— the Fourteenth Amendment—and seeks a decree reinstating Resolutions 1520, 1524 and 1531.

The motion for preliminary injunction which is now before us seeks to enjoin the implementation of Board Resolution 1533 which would adopt and follow the policy which would carry out the practices which existed prior to the Board's adoption of Resolutions 1520, 1524 and 1531. The temporary injunction seeks maintenance of the status quo and, specifically, an order enjoining the School Board from modifying the purchase order for school buses, destroying documents relating or pertaining to the implementation of Resolutions 1520, 1524 and 1531 and, thirdly, from taking any action or making any communications to faculty, staff, parents or students during the pendency of the suit which would make it impossible or more difficult to proceed with the implementation of Resolutions 1520, 1524 and 1531. The defendants have not filed an answer. However, at the hearing they denied that any of their acts were invalid and generally

maintained that they had made good faith efforts to integrate the schools in question to the extent that it was possible to do so considering the geographic circumstances. They further maintained that the segregation, if any, was merely de facto growing out of the neighborhood character of the schools, and that the acts of the School Board do not amount to actionable or de jure segregation.

### III. THE EVIDENCE OF THE CASE

Attention at this hearing has focused primarily on the schools in northeast Denver, and particularly on the area which is commonly called Park Hill. The alleged segregated schools, elementary and junior high schools in this area, have acquired their character as such during the past ten years. The primary reason for this has been the migration of the Negro community eastward from a confined community surrounding what is commonly called "Five Points." Before 1950 the Negroes all lived in a community bounded roughly by 20th Avenue on the south, 20th Street on the west, York Street on the east and 38th Avenue on the north. The schools in this area were, and are now, largely Negro schools. However, we are not presently concerned with the validity of this condition. During this period the Negro population was relatively small, and this condition had developed over a long period of time. However, by 1960 and, indeed, at the present time this population is sizable. As the population has expanded the move has been to the east, first to Colorado Boulevard, a natural dividing line, and later beyond Colorado Boulevard, but within a narrow corridor—more or less fixed north-south boundaries. The migration caused these areas to become substantially Negro and segregated.

The trend of the population was apparent long before the migration of the Negro population eastward to Colorado Boulevard was completed. Notwithstanding this fact, the Barrett Elementary School was built in the late 1950's for the purpose of serving a residential area west of the school, which area was destined in a short time to become populated by Negro families. When this school was completed and opened, its population was predominantly Negro. In a few years it became overwhelmingly Negro in its composition.

In the early 1960's Colorado Boulevard was somewhat of a dividing line and the area east of Colorado Boulevard was for the most part Anglo. Thus Stedman School, which was a few blocks east of Colorado Boulevard, was almost entirely Anglo, while Barrett was predominantly Negro. The migration soon continued across Colorado Boulevard and within a very short time not only was the Stedman School predominantly Negro, the other elementary schools in that area, including Hallett at 2950 Jasmine Street, Smith at 3590 Jasmine Street and Phillips at 6550 East 21st Avenue (to a lesser degree) were also predominantly Negro. The single junior high school, Smiley, at 2540 Holly Street, also became predominantly Negro. Since these students attend East High School, this development threatened to result in East becoming a Negro school as well.

It is noteworthy that notwithstanding that Barrett and Stedman Schools were close to one another, no effort was made by the School Board to incorporate any part of the Stedman district into Barrett. The latter had been constructed as a small school tailored to accommodate the segregated population west of Colorado Boulevard only. None of Stedman's overcrowded white population were diverted to Barrett, and, of course, none of the Barrett students were diverted to the white Stedman.

It is also noteworthy that Negro children who had, prior to the construction of Barrett, attended Park Hill School which had been substantially integrated, were, after the opening of Barrett, required to attend the latter school thus further assuring that Barrett would be black and Park Hill predominantly white.

Notwithstanding the Barrett experience, a recommendation was made in

1962 to construct a junior high school at 32nd and Colorado Boulevard near the Barrett School. This project was rejected after much debate and following public protest that it would be a racially segregated junior high school.

After this junior high school experience, a Special Study Committee on Equality of Educational Opportunity in the Denver Public Schools was created. Its mission was to "study and report on the present status of educational opportunity in the Denver Public Schools, with attention to racial and ethnic factors in the areas of curriculum, instruction and guidance; pupils and personnel; buildings, equipment, libraries and supplies, administration and organization; school-community relations, and to recommend improvements in any or all of such specific areas." The report of the Committee criticized the Board's establishing of school boundaries so as to perpetuate existing de facto segregation "and its resultant inequality in the educational opportunity offered." It recommended that the Board policy consider racial, ethnic and socioeconomic factors in establishing boundaries and locating new schools so as to minimize the effects of de facto segregation. It also recommended that boundaries be set so that the neighborhood established represent a heterogeneous school community.[1]

Following the finding of the Study Committee Report, the Board adopted Policy 5100 which called for changes or adaptations which would result in a more diverse or heterogeneous racial and eth-

nic school population. However, during the years following the adoption of Policy 5100, although there was debate, there was no effective effort in the way of implementation. Finally, another Study Committee was appointed for the purpose of examining existing conditions and recommending specific procedures and guidelines to be taken. At this time there was a proposal to build an addition to the Hallett School and, indeed, it was built over the protest that it would result in intensified segregation. The final report of the second Study Committee was filed on February 23, 1967. The report of the Committee also noticed the intensified segregation in the northeast schools and recommended that there be no more schools constructed in northeast Denver. Finally, on May 16, 1968, the Board adopted the so-called Noel Resolution. This noted that the continuance of neighborhood schools had resulted in the concentration of minority and ethnic groups and called for the establishment of an integrated school population so as to achieve equality of educational opportunity.

On or about January 30, 1969, following the presentation of a plan of integration by the superintendent of schools, the Board adopted Resolution 1520 which made changes in attendance areas of certain secondary schools in the school district, and on March 20, 1969, Resolution 1524, also having to do with secondary schools and junior high schools, was adopted. Resolution 1531, on the other hand, sought to change attendance areas

---

1. In consideration of school-community relations, the Report stated:

   In its study of the Denver community, the Committee finds that de facto segregation exists in Denver, especially in regard to Negro citizens. Even though the Denver Public Schools have not created this pattern of residential segregation, the concentration of certain racial and ethnic groups in certain parts of the city does impose on the schools the same community pattern of de facto segregation.

   The Committee agrees with the statement of the U.S. Supreme Court in 1954 in Brown v. Board of Educa-

   tion that segregated education is inherently unequal education. The Committee further believes that this community pattern of racial and ethnic concentration which produces racially and ethnically concentrated schools adversely affects equal educational opportunity. It further strongly believes that both school and community have a responsibility to minimize the effects of segregation if the principles of the *Declaration of Independence* and the *Constitution* are to be a reality growing out of the daily living experience of all children in the Denver community.

of the elementary schools. In essence, each of these resolutions sought to reverse the segregation trend in some of the segregated schools by boundary changes which would have resulted, had they become effective, in segregated schools becoming predominantly white. It sought to spread the Negro populations of these schools to numerous other schools, thereby achieving what has been described as racial balance in all of them so that their predominantly Negro populations would become roughly 20 percent and white students from other areas would produce an Anglo population in each school of about 80 percent. At least preliminary efforts had been made by the superintendent and his staff to implement these resolutions. However, on June 9, 1969, following a School Board election and a change in the composition of the Board, the resolutions were rescinded following what was regarded as a voter mandate. Two new Board members were elected and two who had supported the integration policies were defeated. The rescission was by specific motions, and there followed a new Resolution, 1533, which undertook to restore the old order.

## IV. ADDITIONAL FINDINGS

The important facts adduced at the hearing deserve special mention as circumstances which serve to show clear patterns of segregation reinforced by official action, and which also show knowing and purposeful conduct.

1. All of the actions of the School Board here under consideration occurred during the last ten years. Thus, they took place long after the decision of the Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

2. The School Board Study Committees of 1964 and 1968 warned the members of the Board concerning the segregation trends and strongly recommended

measures which would avoid or remedy these conditions. The recommendations contained in the 1964 report [2] were, for the most part, ignored, and this led to the appointment of a second implementation Committee which once again was positive and specific in its recommendations.

3. During the entire decade there was regular debate and although resolutions were adopted, no effective action occurred, and many of the actions which were taken had the effect of intensifying rather than alleviating the segregation problem.

4. *Assignment of Teachers.* Schools with predominantly minority student populations were shown to be staffed by a greater proportion of teachers on probationary status, teachers with less than ten years experience and minority group teachers than were schools with a predominantly Anglo student population.[3]

The Board has been reluctant to place Negro and Hispano teachers in white schools because of concern over a possible lack of acceptance by the white community and because of a fear of lack of support by some faculties and principals.[4] The Special Study Committee on Equality of Educational Opportunity in the Denver Public Schools (March 1, 1964) recommended that minority teachers be assigned throughout the system. This recommendation was never adopted by the Board.

By established Board policy (Policy No. 1617A) seniority of service is given consideration in making transfers, and teachers on probationary status are not to be transferred except in unusual situations. Thus, teachers on probation or with less seniority became entrenched in the minority schools where they currently serve.

This tendency to concentrate minority teachers in minority schools has helped

2. Plaintiffs' Exhibit 20.

3. Plaintiffs' Exhibits 92, 93, 94, 96, 8-G, 8-F, 9-G, 9-H.

4. Plaintiffs' Exhibit 20, Pg. D-13.

to seal off these schools as permanent segregated schools.

5. *Establishment of Barrett School.* Plaintiffs' Exhibits 40 and 41 show that Barrett was opened in a segregated area in 1960; that it was located with conscious knowledge that it would be a segregated school; that it has remained segregated to the present date; and that the school would have been desegregated under Resolution 1531. At the time Barrett was built Stedman School, in a predominantly white area, and located a few blocks east of Barrett, was operating at approximately 20 percent over capacity. Yet Barrett was built as a relatively small school and was not utilized to relieve the conditions at Stedman.

6. *Boundary Changes.* In 1962, Superintendent Oberholtzer recommended certain boundary changes to the Board. The Board refused to adopt a change which would have affected the overcrowded conditions at Stedman. The failure to make this proposed change tended to "aggravate and intensify the containment of the Negro population in Stedman at that time."[5] Those boundary changes which were made pertained to areas with Negro populations of less than 3 percent. Other boundary changes not only failed to alleviate Negro concentration; they added to it. In some instances the changes resulted in transfer of white students to white schools.

7. *Concentration in Existing Schools.* In June 1965, the Board considered the addition of eight classrooms at Hallett School. Hallett was at the time overcrowded and had a predominantly Negro student population. Objection was made to the additions on the grounds that they would increase segregation at Hallett.[6] The Board nevertheless proceeded with the additional classrooms. The additions were built despite Paragraph 1b (6) of Board Policy No. 1222C and Paragraph 4 of Policy No. 5100, which provided that ethnic and racial characteristics of a school population should be considered in determining boundaries and that steps should be taken to achieve more heterogeneous school populations.

8. *Mobile Classrooms.* The building of 28 mobile units in the Park Hill area in 1964 (at the time there were only 29 such units in all of Denver) resulted in a further concentration of Negro enrollment in Park Hill schools. The retention of these units on a more or less permanent basis tended to continue this concentration and segregation.

9. *Effect of Resolutions 1520, 1524 and 1531.* Had the rescinded resolutions been implemented, Dr. Bardwell estimated (based on 1968 enrollment figures) that the "segregation index" in senior high schools would have decreased from 50 to 28; that the index in junior high schools would have decreased from 65 to 35; and that the decrease in the index for elementary schools would have been from 60 to 43 which, he testified, would approximately result in desegregation of elementary schools.

10. The above noted Board actions must be considered in the light of the trend toward increased segregation in northeast Denver schools (for example, between 1960 and 1966 Stedman increased from 4 percent Negro to 89 percent Negro; in that same period Hallett increased from 1 percent Negro to 75 percent Negro).

11. The climactic and culminative act of the Board was the June 9 rescission of Resolutions 1520, 1524 and 1531. Four members of the Board voted to rescind the resolutions and adopted Resolution 1533, which embraced policies in derogation of the previous policies as expressed in the mentioned resolutions. The majority of the Board (Board members Voorhees, Noel and Amesse voted against it) acted officially to reject the integration effort and to restore and perpetuate segregation in the area. Although this was carried out in response to what was called a voter mandate, there can be no gainsaying the purpose and effect of the action as one designed to segregate.

5. Transcript, Pp. 180–81.

6. Transcript, Pg. 37.

■ We do not find that the purpose here included malicious or odious intent. At the same time, it was action which was taken with knowledge of the consequences, and the consequences were not merely possible, they were substantially certain. Under such conditions the action is unquestionably wilful.[7]

## V. THE APPLICABLE LAW

■ The foundation stone in any case involving discrimination in public schools is the Constitution of the United States and, in particular, the Equal Protection Clause of the Fourteenth Amendment to the Constitution. That Clause, in guaranteeing to every citizen the equal protection of the laws, forbids state action which results in unreasonable classifications and deprivations. It prohibits arbitrary classifications which bear no rational relation to any valid governmental purpose.

■ The history of modern case law dealing with the invalid discrimination resulting from school segregation dates from 1954, the year in which the Supreme Court handed down Brown v. Board of Ed., 347 U.S. 483, 74 S.Ct. 686. The Supreme Court there held that segregation in public schools violated the Equal Protection Clause. However, the case certainly went much further than this. The Court plainly stated that segregated schools are incapable of providing quality education and also said that the effect of segregation in the school system was to place an indelible stamp of inferiority on those Negro children who were compelled to attend "Negro" schools. Thus, the clear import of the Brown decision is that neither a state nor its agencies may establish, maintain or lend support to a system of segregated public education. Furthermore, if the state or any of its agencies prior to or after Brown take any action which creates or furthers segregation, a positive duty arises to remove the effects of such de jure segregation.

Admittedly, the facts of the case at bar are different from Brown, but the legal implications of the Brown case are fully applicable here. These legal implications have been considered in two opinions of our Court of Appeals. The first of these cases, Downs v. Board of Ed., 336 F.2d 988 (10th Cir. 1964), dealt with the Kansas City school system. Until 1951 this school system had been segregated by law and, at the time that Brown was decided, the schools remained substantially segregated. Thereafter, the school board took affirmative steps to alleviate the situation created by the prior policy of segregated schools. The trial court found that the board had acted in good faith to remove segregation in the school system and that the minimum requirements of Brown had been met. The board had also undertaken to change certain school district boundaries and these changes had the effect of aggravating segregation in at least one of the city's junior high schools. The trial court held that the board's action did not violate the Fourteenth Amendment since the boundary change was made in good faith and not for the purpose of promoting or maintaining segregation.

In affirming the district court, the Court of Appeals laid down guiding principles to be applied in future cases. It distinguished two factual situations: (1) Where the school board takes affirmative action which has the effect of promoting or maintaining segregation; and (2) Where because of population shifts and housing patterns certain schools have become segregated—so-called de facto segregation. As to the former, the Court said that it must appear that the board's action not only resulted in aggravating segregation, but also that the board acted purposefully with this object in mind. As to the latter, the Court said that the better rule was that there is no affirmative duty to integrate races in the public schools.[8] The trial court in Downs had found that the school board in that case

---

7. Restatement of Torts, § 500, comments f and g at 1296 (1934).

8. Whether the Court would now give broad effect to this is, of course, irrelevant in

had made a good faith attempt to conform to the law. The Circuit Court was reluctant to overturn these findings since the district court had heard the evidence.

In Board of Ed. of Oklahoma City Public Schools, etc. v. Dowell, 375 F.2d 158 (10th Cir. 1967), the Tenth Circuit Court of Appeals affirmed the decision of the District Court of Oklahoma, which Court had ordered the school board of Oklahoma City to undertake a plan for desegregation, which plan had been formulated by experts appointed by the Court. Thus, in reality it was the Court's plan. Prior to *Brown* the Oklahoma City school system was segregated pursuant to constitutional and statutory mandate. Both the trial court and the Tenth Circuit read the *Brown* decision as requiring affirmative action to remove segregation which had been purposefully caused by prior actions of the school board. The opinion by Judge Hill saw nothing new in a court of equity taking positive steps to integrate the schools.

■■■ It is sufficient to say that we are not here faced with the kind of simple or innocent de facto segregation which was found to exist in *Downs*. We have seen that during the ten year period preceding the passage of Resolutions 1520, 1524 and 1531, the Denver School Board has carried out a segregation policy. To maintain, encourage and continue segregation in the public schools in the face of the clear mandates of Brown v. Board of Ed. cannot be considered innocent. The many cases decided subsequent to *Brown,* including our own Circuit's Board of Ed. v. Dowell, impose an affirmative duty on the School Board to take positive steps to remove that segregation *which has developed as a result of its prior affirmative acts.* In response to this duty, the Denver School Board passed Resolutions 1520, 1524 and 1531. In light of *Brown* and *Dowell,* the effort of the Board to renounce this constitutional duty by rescission must be rejected as arbitrary state legislative action.

■■ The defendants have alluded to the fact that Resolution 1533 represents the will of the people, and that any action taken by this Court which would adversely affect the Resolution would frustrate that will. But as we have seen Brown v. Board of Ed. and all of the subsequent cases hold that equal protection of the laws is synonymous with the *right* to equal educational opportunities and that segregated schools can never provide that equality. The constitutional protections afforded by the Bill of Rights and the Fourteenth Amendment were designed to protect fundamental rights, not only of the majority but of minorities as well, even against the will of the majority. The effort to accommodate community sentiment or the wishes of a majority of

the present case, but in view of later developments in the law, the question arises as to whether it would say the same thing today since the cases which it cited in support of this proposition have been largely overruled. Thus, in United States v. Jefferson County Bd. of Ed., 380 F.2d 385 (5th Cir. 1967) (en banc), the Fifth Circuit Court of Appeals overruled four of the opinions cited in support of the statement in *Downs* that "the better rule is that although the Fourteenth Amendment prohibits segregation, it does not command integration of the races in the public schools * * *." (Evers v. Jackson Municipal Separate School Dist., 328 F.2d 408 (5th Cir. 1964) ; Stell v. Savannah-Chatham County Bd. of Ed., 333 F.2d 55 (5th Cir. 1964) ; Boson v. Rippy, 285 F.2d 43 (5th Cir. 1960) ; and Avery v. Wichita Falls Independent School Dist., 241 F.2d 230 (5th Cir. 1956)). The *Jefferson County* opinion states:

The Court holds that boards and officials administering public schools in this circuit have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools— just schools. Expressions in our earlier opinions distinguishing between integration and desegregation must yield to this affirmative duty we now recognize. (Footnotes omitted).

380 F.2d at 389.

voters, although usually valid and desirable, cannot justify abandonment of our Constitution. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); [9] Lucas v. Forty-Fourth General Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

It is to be emphasized finally that this present case, except for the presence of clear evidence of purpose manifested by the precipitate rescission, is by no means novel. The right to equality in education has, since *Brown,* become recognized as a sensitive constitutional right. Courts throughout the country have taken positive, affirmative steps in order to uphold these rights. In our own Circuit, both the *Downs* and *Dowell* opinions have clearly identified and explained the governing legal principles. In other jurisdictions, United States Courts have granted broad affirmative relief in such situations, including orders requiring the adoption of detailed plans for segregation.[10] In the present case, this Court has held only that the Denver School Board may not constitutionally take action which perpetuates segregation, and so it sets no new precedent.

In determining that the plaintiffs are entitled to the preliminary relief sought, we are not to be understood as holding that Resolutions 1520, 1524 and 1531 are exclusive. It is true that the case is extraordinary in that there are only two plans presented, one calling for integration and one for segregation. The status quo has the effect of restoring the integration plan. However, the Board is by no means precluded from adopting some other plan embodying the underlying principles of Resolutions 1520, 1524 and 1531.

## VI. CONCLUSION

▮ Under the Fourteenth Amendment the plaintiffs, as citizens of the United States, have the right to be protected from official action of state officers which deprives them of equal protection of the laws by segregating them because of their race. The denial of an equal right to education is a deprivation which infringes this constitutional guarantee. The precipitate and unstudied action of four of the members of the Board rescinding and nullifying the school integration plan, which plan had been adopted after almost ten years of debate and study, and the adoption in its place of a substitute plan which would have had the effect of perpetuating school segregation, had not only a chilling effect upon their rights; it had a freezing effect. Under the law of the case, we have no alternative. The action taken must be ruled unconstitutional, and the proposed action must be enjoined.

▮ The case is a proper one for injunctive relief because (1) Plaintiffs have no adequate remedy at law; (2) Plaintiffs would suffer irreparable injury if relief were denied; and (3)

9. In this case, the Supreme Court struck down a California constitutional amendment on the ground that it was not merely a repeal of a positive action encouraging integration, but that the rejection, in effect, authorized discrimination by turning back to the conditions which existed prior to its adoption. It thus encouraged and in a significant way involved the state in racial discrimination contrary to the Fourteenth Amendment. Hence, it was not an exhibition of complete neutrality.

10. *See, e. g.,* United States v. School Dist. 151, 286 F.Supp. 786 (N.D.Ill.), *aff'd.,* 404 F.2d 1125 (7th Cir. 1968); Coppedge v. Franklin County Bd. of Ed., 273 F.Supp. 289 (E.D.N.Car.), *aff'd.,* 394 F.2d 410 (4th Cir. 1968); Hobson v. Hansen, 269 F.Supp. 401 (D.D.C.1967), *aff'd sub nom.,* Smuck v. Hobson, 408 F.2d 175 (D.C.Cir. 1969); Blocker v. Board of Ed., 226 F.Supp. 208 (E.D.N.Y.1964); Taylor v. Board of Ed., 191 F.Supp. 181 (S.D.N.Y.), *aff'd.,* 294 F.2d 36 (2d Cir. 1961).

In our own Circuit, sweeping plans for desegregation were formulated by the United States District Court for the Western District of Oklahoma on its own initiative after the school board failed to act, and these plans were approved by the Court of Appeals. Dowell v. School Board of Oklahoma City Public Schools, 244 F.Supp. 971 (W.D.Okl.), *aff'd.,* 375 F.2d 158 (10th Cir. 1967).

In *Hobson,* Circuit Judge Wright, sitting by assignment in District Court, adopted an intricate and detailed integration plan.

Plaintiffs will probably succeed at trial, at least on the cause of action under consideration.

The motion for preliminary injunction is granted.