**Harry N. HUSBANDS et al.**

v.

**COMMONWEALTH OF PENN-SYLVANIA et al.**

**Civ. A. No. 72–1254.**

United States District Court,
E. D. Pennsylvania.

March 31, 1975.

See also, D.C., 359 F.Supp. 925.

Joseph P. Caranci, Jr., Natale, Zetusky & Stewart, Media, Pa., for plaintiffs.

Melvin G. Levy, Chester, Pa., Lewis B. Beatty, Jr., Media, Pa., Burton D. Morris, Deputy Atty. Gen., Dept. of Justice, Harrisburg, Pa., Leo A. Hackett, Media, Pa., Peter J. Nolan, Chester, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

This is an action for declaratory judgment and injunctive relief, brought under 42 U.S.C. §§ 1981 and 1983 by the parents of public school children within Delaware County, Pennsylvania, challenging the reorganization of certain school districts in that county in 1968. The plaintiffs charged that as a result of such reorganization by the above-named defendants, they have been forced to attend schools within racially and economically segregated districts and accordingly, have been deprived of rights, privileges and immunities secured by the Constitution and laws of the United States. The plaintiffs pray for an injunction, altering and revising or ordering defendants to alter and revise the Delaware County School Reorganization Plan, declaratory relief as to the unconstitutionality of said plan in its present configuration, an injunction restraining the levy of taxes by the defendants without equalization of assessment ratios and declaratory relief as to the unconstitutionality of public school financing which places substantial dependence upon local property taxes.

All defendants filed answers, generally denying the allegations contained in plaintiffs' causes of action and raising new matter.

The defendants also moved this Court to abstain or dismiss the complaint because: (1) the plaintiffs' first cause of action failed to state a claim upon which relief could be granted; (2) the plaintiffs lacked standing to raise the racial issues contained in the first cause of action; (3) there is no federal right to relief from de facto segregation; (4) the plaintiffs failed to exhaust administrative remedies available under state law and thus should not have access to the federal courts; (5) the plaintiffs failed to join necessary parties-defendant; (6) this Court is without proper jurisdiction to determine the merits of plaintiffs'

fourth cause of action; (7) the action was barred by res judicata; (8) in the alternative, this Court should abstain; (9) the plaintiffs' complaint failed to allege any violation of any right, privilege or immunity, protected or guaranteed by the Constitution or laws of the United States; (10) the plaintiffs' complaint failed to allege a constitutionally prohibited state enforced system of racial segregation; (11) the plaintiffs' allegations of economic discrimination did not establish the violation of any right, privilege, or immunity protected by the Constitution or laws of the United States; and (12) plaintiffs' complaint was barred by 28 U.S.C.A. § 1341.

By opinion and order dated May 22, 1973, this Court held that plaintiffs' complaint did state a claim upon which relief could be granted; that the plaintiffs did have the standing to raise the racial issues contained in the first cause of action; that the second cause of action that alleged that the Delaware County Plan of School Reorganization created severe economic imbalance, thus denying plaintiffs' equal educational opportunities, was actionable under 42 U.S.C.A. § 1983; that the fourth cause of action that alleged that the method of school financing employed by defendants with its substantial dependence on local property taxes creating discrimination was actionable under 42 U.S.C.A. § 1983; but that this particular issue should be referred to a three judge federal court; that this court did have jurisdiction over the subject matter of the third cause of action; that all parties necessary had been joined as defendants; and that this was not the proper time to raise the issue of res judicata.

On January 17, 1973, this court entered an order under which the time in which the plaintiffs were required under Local Rule 45 to file a Motion for Class Action Determination was extended for ninety (90) days from the date of this Court's determination on defendants' motions to dismiss plaintiffs' complaint.

On February 23, 1973, the plaintiffs filed a motion for determination of class pursuant to said local rule. By memorandum and order dated May 22, 1973, this Court determined that this suit was properly maintainable as a class action under Rule 23(b)(2).

Trial of the plaintiffs' causes of action was held as scheduled on Monday, November 19, 1973, and continued through Tuesday, November 20, 1973. Before and during this trial all parties submitted certain stipulations and exhibits, all of which have been made part of the record. All parties had an opportunity to offer testimony in their behalf. The trial was concluded with the request by this Court for all parties to submit requests for findings of fact and conclusions of law. Additionally, this Court requested that all parties submit memoranda regarding the issue of res judicata. Such memoranda were tendered by all parties. The defendants also submitted requests for findings of fact and conclusions of law on the issue of res judicata as distinguished from the requests for findings and conclusions on the merits of plaintiffs' causes of action.

On April 29, 1974, this Court and all parties agreed that this Court would await the Supreme Court's decision in Milliken v. Bradley before this Court rendered its decision in this case.

On July 25, 1974, the Supreme Court rendered its decision in *Milliken*, and the parties in the instant case submitted briefs to this Court on the impact of *Milliken* by September 12, 1974.

On December 11, 1974, this Court issued sua sponte an order giving plaintiffs thirty (30) days to submit a memorandum outlining any additional evidence they desired to present concerning the relative economic and administrative feasibility of alternative reorganization plans to that chosen by Delaware County in 1968, but by letter of January 7, 1975, counsel for plaintiffs advised this court that plaintiffs desired to present no additional evidence and would stand on the record.

On the basis of the record before us, we have reached the findings of fact and conclusions of law set forth below.

## FINDINGS OF FACT

*Parties.*

1. Plaintiffs are: Harry N. Husbands and Sharon E. Husbands, his wife, individually and as parents of their minor child, Tomi R. Husbands; Joan Green, individually and as mother of her minor children, Diana Green and Edgar Green; Vincent R. Bartholf and June C. Bartholf, his wife, individually and as parents of their minor children, Debbie Bartholf, Brenda Bartholf and Dawn Bartholf; Joseph G. Derrickson and Bertha I. Derrickson, his wife, individually and as parents of their minor children Danita Derrickson and Joseph Derrickson; Nelson B. Sabean and Marjorie Sabean, his wife, individually and as parents of their minor children, Mark Sabean and Michele Sabean; Charles Rovane and Irene Rovane, his wife, individually and as parents of their minor children Joan Rovane and Victoria Rovane; Filmore Ott and Carol Ott, his wife, individually and as parents of their minor children, Philip Ott, Joanne Ott, John Ott, Carole Ott, Michael Ott and Patricia Ott; Joseph J. Nolan and Mary E. Nolan, his wife, individually and as parents of their minor children Joseph J. Nolan, Matthew Nolan, Steven Nolan and Andrew Nolan; John E. Fitzgerald and Joanne M. Fitzgerald, his wife, individually and as parents of their minor child, Debra Fitzgerald; David W. Clifton and Florence Clifton, individually and as parents of their minor children, Robert Clifton, James Clifton and Raymond Clifton; Francis Grant and Helen Grant, his wife, individually and as parents of their minor children, Daniel Grant, Paul Grant, Eric Grant, Maureen Grant, Mary Beth Grant and Francis Grant; Donald Hartnett and Virginia Hartnett, his wife, individually and as parents of their minor children, Donald Hartnett and Craig Hartnett; Wilmer Bowers and Jean Bowers, his wife, individually and as parents of their minor child, Donna Bowers; Richard Larkin and Jeanette Larkin, his wife, individually and as parents of their minor children, Richard Larkin, Jr., Michael Larkin and Mary Patricia Larkin.

2. Plaintiffs are duly qualified electors, citizens, taxpayers and parents of school age children who reside within either Administrative Unit 4, 5, or 12, as these units are presently constituted within Delaware County, Pennsylvania. With the exception of the child of named Plaintiffs Harry N. Husbands and Sharon E. Husbands, one child of Vincent R. Bartholf and June C. Bartholf, and the two children of John E. Fitzgerald and Joan M. Fitzgerald, the school age children of the named plaintiffs attend the public schools within the administrative unit in which they reside. The Husbands' child, Tomi, although of the Methodist religion like his parents, attends St. Joseph's Roman Catholic School. The Bartholfs' child, Brenda, who would attend Chester High School if she were enrolled in the Chester-Upland School District, attends Chichester School District High School, where she was enrolled in September, 1972, the first school term after the merger of the City of Chester and Borough of Upland School Districts on July 1, 1972. The two school age Fitzgerald children, who reside in Darby Township, within Administrative Unit 5, attend St. Clement's Roman Catholic School.

3. This case involves questions of law and fact common to all the members of the plaintiff class. Named plaintiffs' claims are typical of the claims of the class and named plaintiffs will fairly and adequately protect the interests of the class.

4. The persons constituting the class of which plaintiffs are a part is in excess of 50,000, so numerous as to make it impracticable to join all as parties.

5. The named plaintiffs have not given notice of this action to any members of the class other than the named

plaintiffs, and this Court did not direct notice to be given by the named plaintiffs to the members of the Class in this proceeding.

6. The named plaintiffs and all of their children are of the Caucasian race.

7. Plaintiffs did not at any time prior to instituting this suit consult with any minority persons or minority organizations concerning the basis for the legal action herein.

8. The named plaintiffs have annual earnings from a low of $9,464.00 to a high of $18,000.00. (Stipulation)

9. Defendants are: Commonwealth of Pennsylvania; John C. Pittenger, Secretary of Education of the Commonwealth of Pennsylvania; W. Deming Lewis, Chairman of the Pennsylvania State Board of Education; James M. Lambert, President of the Delaware County Intermediate Unit Board of School Directors; Delaware County Intermediate Unit Board of School Directors; Edward Grosse, President of Interim Operating Committee for Administrative Unit No. 4; Franklin A. Yeager, President of Interim Operating Committee for Administrative Unit No. 5; Interim Operating Committee for Administrative Unit No. 5; Clarence Roberts, President of Interim Operating Committee for Administrative Unit No. 12; and Interim Operating Committee for Administrative Unit No. 12.

10. Defendant Commonwealth of Pennsylvania has the duty under Article III, Section 14 of the Pennsylvania Constitution, P.S., to maintain and support a thorough and efficient public school system.

11. Defendant Commonwealth of Pennsylvania has the ultimate power, authority and responsibility to create school districts and to establish and alter boundaries of the areas served by said school districts.

12. Defendant, John C. Pittenger, is the duly appointed Secretary of Education for the Commonwealth of Pennsylvania.

13. Defendant Pennsylvania State Board of Education ("State Board") is a state administrative board charged with the general supervision and control of the educational interests of the Commonwealth. Defendant W. Deming Lewis was the Chairman of the Pennsylvania State Board of Education when this action was filed.

14. Defendant Delaware County Intermediate Unit Board of School Directors, pursuant to Pennsylvania Public School Code, as amended, (24 P.S. Section 9–951 et seq.) on July 1, 1971, became the successor to the Delaware County Board of School Directors. Said defendant is charged with providing the essential services formerly provided by the County Board and with the administration of the program of services of Intermediate Unit 25, comprising all school districts in the County of Delaware. Defendant James M. Lambert was President of the Delaware County Intermediate Unit Board of School Directors when this action was filed.

15. Defendants, Interim Operating Committee of Administrative Units No. 4, No. 5, and No. 12 were the duly appointed committees responsible for the organization of said units and became the Boards of School Directors for said reorganized school districts on July 1, 1972.

16. Defendants, Edward Grosse, Franklin A. Yeager, and Clarence Roberts at the time this action was filed were the duly elected Presidents of the respective defendant Boards of School Directors of School Districts No. 4, No. 5, and No. 12.

*School Reorganization Legislation and Standards.*

17. The Commonwealth of Pennsylvania does not maintain a dual racial system of education by legislative or constitutional requirement.

18. During the 1960's the Pennsylvania Legislature on three occasions enacted legislation to reorganize school

districts in Pennsylvania's public school system.

(a) the first Act—Act of September 12, 1961, P.L. 1283, No. 561, 24 P.S. § 2–281 et seq. (Act 561)—directed each county board of school directors to prepare on or before January 1, 1963 a plan of organization of administrative units for the County for review by the State Council of Education. 24 P.S. §§ 2–282, 2–283.

(b) Act 561 was superseded by the Act of August 8, 1963, P.L. 564, No. 299, 24 P.S. § 2–290 et seq. (Act 299). Act 299 directed each county board of school directors to prepare on or before July 1, 1964 a plan of organization of administrative units for the county and directed the State Council of Basic Education to review organization plans prepared by the county boards and to approve such plans as it deemed wise in the best interest of the educational system of the Commonwealth, provided that these plans met certain requirements specified in Act 299. 24 P.S. §§ 2–290, 2–293. In preparing reorganization plans pursuant to Act 299, the county boards were not bound by any proposals contained in reorganization plans prepared pursuant to Act 561. 24 P.S. § 2–292. In dealing with school districts which had previously entered into a written agreement for the establishment of a joint school or department, however, the county boards were prohibited from proposing any administrative units which in whole or in part comprised less than all of the school districts joined by such agreement. 24 P.S. § 2–292.

(c) Act 299 was superseded by the Act of July 8, 1968, P.L. 299, No. 150, 24 P.S. § 2400 et seq. (Act 150), (Supp. 1974). Act 150 directed each county board of education to prepare within 90 days a plan of organization of administrative units comprised of school districts which were not in an administrative unit established as a school district under Act 299. 24 P.S. § 2400.2. Act 150 provided, however, that the plan of administrative units could include the placement of one or more school districts in an administrative unit established as a school district under Act 299 if the school district established under that act agreed thereto. 24 P.S. § 2400.2(b).

19. Acts 299 and 150 both provided for the plan of organization of administrative units to conform to standards for approval of administrative units adopted by the State Board and directed the State Board to prepare such standards, taking into account the following factors: topography, pupil population, community characteristics, transportation of pupils, use of existing buildings, existing administrative units, potential population changes and the capability of providing a comprehensive plan of education. 24 P.S. §§ 2400.1 and 2400.2; 24 P.S. § 2–291.

20. Pursuant to the above provisions of Act 150, the State Board adopted Standards for Approval of Administrative Units. These standards, *inter alia*, provided that:

(a) An administrative unit shall be planned to offer a full program of instruction, kindergarten or grade one through twelve, and provide administrative leadership, supervision and instruction at a reasonable cost consistent with the local taxable wealth and State financial support available per pupil.

(b) An administrative unit shall make available an educational program and educational opportunities to meet the varying needs, aptitudes, abilities, and interests of individuals residing in the administrative unit.

(c) Consideration should be given to whether a geographic area has developed the characteristics of a community. Community, as used here, includes one or more municipalities and the surrounding territory from where people come for business, social, recreational, fraternal or similar reasons. Neither race or religion shall be a factor in determining administrative unit boundaries and differences in the social and economic level of the popula-

tion shall not be a basis to determine these boundaries.

(d) Pupil population changes may be considered in the planning of administrative units where the changes are supported by reliable studies of area development showing past pupil population trends and future projections based on recognized statistical methods.

(e) Consideration shall be given to the capability of providing a comprehensive program of education which shall mean the ability to educate and train each child within his capacity to the extent demanded by the immediate requirements of his growth and his relationship to the strengthening of this Commonwealth and nation, and shall include, but not be limited to, wealth per pupil, qualifications of professional staff, enrollment and diversification of curriculum. (Exhibit P–2)

21. A letter from the Superintendent of the Department of Public Instruction advised the county boards, including the Delaware County Board, that the intent of the language of the last sentence of the above paragraph (c) was to prevent de jure segregation through the fixing of school district boundaries and that the language was not to be construed to permit de facto segregation on the basis of race, religion or national origin. (Exhibit P–43, N.T. 82, 83)

*School Districts Established in Delaware County by the State and County Boards under Acts 299 and 150.*

22. Under Act 299, the following Administrative Units within Delaware County were reorganized on August 11, 1965:

Administrative Unit 1—Radnor Township

Administrative Unit 2—Haverford Township

Administrative Unit 7—Ridley Park Borough, Ridley Park Township, and Eddystone Borough

Administrative Unit 9—Marple—Newtown

Administrative Unit 10—Media Borough and Rose Tree Union

Administrative Unit 13—Chichester Jointure (Lower Chichester and Upper Chichester), Marcus Hook Borough, Trainer Borough. (Ex. P–9, N.T. 299).

23. The above plan of August 11, 1965, was a revision of a plan adopted by the Delaware County Board of School Directors on May 6, 1964. (Ex. P–9). The sole difference between the plans of May 6, 1964, and August 11, 1965, lay in the transfer of the Darby-Colwyn Jointive from Administrative Unit 5 to Administrative Unit 4. This amendment of the County Board's Plan was made by the State Council of Basic Education, acting upon the directive of the State Board of Education. (Ex. P–9, N.T. 304). Neither Administrative Units 4 nor 5, however, were reorganized under Act 299. (Ex. P–9, N.T. 299).

24. Pursuant to the mandate of Act No. 150 of 1968 (24 P.S. § 2400.1 et seq.) the Delaware County Board of School Directors on October 2, 1968, adopted the following plan for the reorganization of school districts that had not been reorganized under Act 299:

Unit 3: School Districts of the Boroughs of Clifton Heights and Millbourne and of the Township of Upper Darby.

Unit 4: School Districts of the Boroughs of Darby and Colwyn (Darby-Colwyn Jointure), the Boroughs of Lansdowne, Aldan, and East Lansdowne (Lansdowne-Aldan Jointure) and of the Borough of Yeadon.

Unit 5: School Districts of the Boroughs of Collingdale, Folcroft and Sharon Hill and of the Township of Darby.

Unit 6: School Districts of the Boroughs of Glenolden, Norwood and Prospect Park (Interboro Jointure) and of the Township of Tinicum.

Unit 8: School Districts of the Borough of Morton and of the Township of Springfield.

Unit 11: School District of the Township of Nether Providence and the Swarthmore-Rutledge Union School District.

Unit 12: School Districts of the City of Chester, of the Township of Chester and of the Borough of Upland.

Unit 14: Penn-Delco Union School District.

Unit 15: School Districts of the Borough of Chester Heights and of the Township of Bethel and Concord (Garnet Valley Jointure). (Stipulation 1, Ex. P-10)

25. The reorganization of Units 4, 5, and 12 took place on July 1, 1972. It is these reorganizations which are here at issue.

*Demographic Characteristics of Delaware County.*

26. Under 1970 census figures, the nonwhite population of Delaware County comprises 7.6% of the total population. (Ex. P-23) This percentage has remained at or around 7% since 1940 (Ex. P-22).

27. As of 1968, the public school population of Delaware County was 12.9% Black. (Ex. P-37).

28. At the time of reorganization pursuant to Act 150 in 1968, there were within Delaware County five (5) school districts in which the percentage of black students within the district exceeded the 12.9% figure for the entire county. These were: Darby-Colwyn, 22.1%; Yeadon Borough, 34.2%; Darby Township, 68.2%; Chester City, 67.-9%; and Chester Township 62.1%. (Ex. P-37).

29. As noted above, each of these districts was ultimately placed within one of the three administrative units challenged in this case. Chester City and Chester Township were joined with Upland Borough to form Administrative Unit 12; Darby-Colwyn and Yeadon were joined with Lansdowne-Aldan to form Administrative Unit 4; and Darby Township was joined with Collingdale, Folcroft, and Sharon Hill to form Administrative Unit 5. (Ex. P-10, Stipulation 1)

*Administrative Unit 12.*

30. As noted above, Administrative Unit 12 comprises the former school districts of Chester City, Chester Township, and Upland Borough.

31. In 1968, Administrative Unit 12 contained 13.6% of the total student population of Delaware County. (Ex. P-37).

32. At the time the 1968 reorganization plan was adopted, the student population of Chester City was 11,725, of which 7,959, or 67.9%, were black. (Ex. P-37).

33. Chester City's total student population of 11,725 comprised 88.9% of Administrative Unit 12's total student population of 13,184 in 1968. (Ex. P-37).

34. At the time of the 1968 reorganization plan, the black student population of Chester City constituted approximately 63.9% of the total black student population of Delaware County. (Ex. P-37).

35. The population of Chester City has over the years become increasingly black. Blacks comprised 20.9% of the city's total population in 1950, 33.3% in 1960, and 45.2% in 1970. (Ex. P-23).

36. These population shifts have had their effects on the City of Chester school population. Dr. John J. Vaul, Superintendent of the Chester-Upland School District, testified in the Delaware County case of Cleary v. Dalton, No. 13358 of 1971, the record of which is, by stipulation, part of the record in these proceedings, that years ago the racial composition of the City of Chester school system was about twenty percent black and eighty percent white, whereas in 1973 it was about seventy-six percent black and twenty-four percent white. (Ex. P-36)

37. At the time of the 1968 reorganization plan, the student population of Chester Township was 850, of which 528, or 62.1% were black. (Ex. P–37).

38. In contrast with Chester City, Chester Township has become increasingly white in its overall population, both by virtue of a decrease in the black population and an increase in the white. From 1960 to 1970, the white population of Chester Township increased from 1,183 to 3,826, while the non-white population decreased during the same time period from 2,419 to 1,882. (N.T. 245, 246). In terms of percentages, the population of Chester Township was 69.5% black in 1950, 67.-1% black in 1960, and 32.7% black in 1970 (Ex. P–23).

39. At the same time, the population of Chester Township is estimated to increase steadily. While the Township's population was 3,062 in 1960, it is estimated to be 9,200 by 1980. (N.T. 246). If the above racial and population trends continue, Chester Township would thus appear likely to continue to become increasingly white.

40. These population trends of Chester Township overall have been reflected as well in the township's student population, which was 62.11% black in 1968, but 56.5% black in 1971. (N.T. 292).

41. In 1968, Chester Township's 850 students constituted 6.4% of the total student population of the proposed Administrative Unit 12. (Ex. P–37). In 1971, the comparable figure was 6.6% (Ex. P–19).

42. At the time of the 1968 reorganization plan, the total student population of Upland Borough was 609, of which 3, or .49% were black. (Ex. P–12, P–19).

43. Upland is virtually an all white community, with only 66 blacks in 1960, and only 27 in 1970. (Ex. P–1).

44. The trend in Upland's overall population towards becoming virtually all-white has reflected itself in Upland's student population, which went from .49% black in 1968 to .40% black in 1970, or a total of 3 black students of 630 total students. (Ex. P–12, P–19).

45. In 1968, Upland's 609 students constituted 4.6% of the total student population of 13,184 in the proposed Administrative Unit 12. (Ex. P–37). In 1971, the comparable figure was 5.2%. (Ex. P–19).

46. Both the Delaware County School Board and the State Board of Education had available the data on racial concentration in Administrative Unit 12 and Delaware County prior to and during the formulation of the 1968 reorganization plan. (N.T. 63, 308).

47. The Delaware County School Board knew that it was joining areas of substantial black populations in joining Chester City and Chester Township. (N.T. 306).

48. The administrative unit formed in 1968 by the combination of Chester City, Chester Township, and Upland Borough contained 13,184 students, of which 8,490, or 64.4% were black. As of 1972, this figure had increased to 71%. (Ex. P–37).

49. In 1968, Administrative Unit 12 contained 68.2% of the total black student population in Delaware County; Unit 5, with the next highest black concentration, had 9.6% of the total county black population.

50. As of 1972–73, Administrative Unit 12 contained approximately 66.9% of the total black student population of Delaware County. (Ex. P–37)

51. Administrative Unit 12 had the highest percentage of black students within its total student population of any administrative unit in the Commonwealth, approximately 9% higher than the next ranking unit. (Ex. P–34, N.T. 75).

52. Prior to reorganization, the City of Chester School District had been cited by the Pennsylvania Human Relations Commission concerning de facto segregation in the City's schools, and had been ordered by the Commission and the Department of Education to submit

a desegregation plan. (N.T. 122). The Delaware County School Board was aware of such order at the time of reorganization. (N.T. 27). The city submitted several plans, several parts of which the Human Relations Commission approved. (N.T. 122). The remaining unapproved part concerned desegregation of the city's elementary schools, concerning which the Department of Education and the newly created Chester-Upland District (Administrative Unit 12) were conducting meetings at the time of the trial of this case. (N.T. 121–123).

53. The Chester City School District had also been cited by the Human Relations Commission with respect to integration of its schools' staffs, but this matter had subsequently been adjusted by the time of the trial of this case. (N.T. 127, 128).

54. Chester Township had likewise prior to the 1968 reorganization been cited by the Human Relations Commission and asked to submit a desegregation plan. (N.T. 123). The Delaware County School Board was aware of this order against the Township. (N.T. 27). The Township subsequently submitted a plan which the Human Relations Commission approved. (N.T. 123).

55. Prior to reorganization, the Delaware County Board of School Directors had been cited concerning pupil assignment and racial makeup, but the Human Relations Commission issued no desegregation order when it learned that the pupils in question were all special education students. (N.T. 124).

56. The record indicates neither the Human Relations Commission nor any of its subdivisions made any written communication to the Delaware County School Boards concerning the Commission's position to the proposed merger of the Chester City and Chester Township school districts. (N.T. 119).

57. The record similarly indicates no written communication from the Human Relations Commission or any of its subdivisions to the State Board of Education concerning the propriety of sustaining or not sustaining Administrative Units 4, 5, and 12 in the appeals before the State Board. (N.T. 150).

58. At the time of reorganization, Chester City desired not to be merged with any other district, and especially not with the adjacent Nether Providence district. (N.T. 308).

59. Chester City opposed its consolidation with Chester Township, on grounds that both districts already had substantial black concentrations, and on financial grounds as well. (N.T. 27, 30).

60. Chester ultimately appealed the proposed Unit 12 to the State Board of Education and then to the courts. (N.T. 308).

61. The State Department of Education requires every school district to submit a long range development program to show the plans of the school district for school construction or curriculum change. The State Board of Education has issued a School Administrator's Handbook containing guidelines for the preparation of such long range developmental plans.

62. On January 11, 1968, prior to the adoption of the Delaware County reorganization plan, the State Board amended the Handbook to provide that school districts had an obligation of affirmative action to eliminate "de facto" segregation, defined as

". . . the racial imbalance in schools which occurs when the number of Negroes in a compact Negro area becomes so great that drawing school zone boundaries on a geographical basis caused the great majority of Negro children to attend schools which are overwhelmingly Negro in population." (P–60).

63. The guidelines, however, were addressed to individual school districts or administrative units regarding action to be taken after the districts or units had been reorganized under Act 150 by their county school boards. These

guidelines were not addressed to the county school boards themselves. (N.T. 121).

64. Act 150 provided that except for non-contiguous districts which had previously been joined, only those districts that were contiguous could be merged. Pa.Stat.Ann. tit. 24, § 2400.2 (Supp. 1974). Similarly, the Standards for Approval of Administrative Units, adopted and issued to the county school boards by the State Board of Education, provided:

"An administrative unit shall be planned as a contiguous geographic area. Exceptions to contiguity may be made only in situations where the administrative unit in whole or in part includes a noncontiguous, geographic area which had previously been approved by the State Board of Education as an administrative unit or had operated as an administrative unit, a school district or a joint system during the 1967–68 school year."

65. The record indicates that none of the component districts of Administrative Unit 12 had ever been part of an administrative unit, school district, or joint school system with any non-contiguous district prior to reorganization in 1968, although students from Upland had attended high school in Collingdale (now part of Administrative Unit 5). (N.T. 336).

66. Under the 1968 Delaware County Reorganization Plan, the Chester-Upland Administrative Unit (Adm. Unit 12) was bounded on the east by the Ridley Unit (Adm. Unit 7), which in 1968 had a student population 2.9% black; on the north by the Wallingford-Swarthmore Unit (Adm. Unit 11), which had a 5.5% black student population; to the northwest by the Penn Delco Unit (Adm. Unit 14), with a 0% black student population; and to the southwest by the Chichester Unit (Adm. Unit 13), with a black student population of 8.1% (Ex. P–10, P–37).

67. Act 150 also provided, however, that no district placed in an administrative unit under Act 299, the predecessor of Act 150, could be placed in an administrative unit under Act 150 unless the district consented. Pa.Stat.Ann. tit. 24, § 2400.2 (Supp.1974).

68. Since the Ridley and Chichester Administrative Units (Adm. Units 7 and 13) had been reorganized under Act 299 (N.T. 299, 300), neither of these units could thus have been merged without its consent with either Administrative Unit 12 as a whole or to any of its component districts.

69. The record does not establish whether either the Ridley or Chichester Unit was asked whether it would consent to merger with Administrative Unit 12 or any of its component districts. The record suggests, however, that no such request of either the Ridley or Chichester Unit was ever made. (N.T. 144).

70. Prior to the adoption of its reorganization plan, the Delaware County Board of School Directors had compiled a study showing the racial composition of alternative administrative units to those incorporated in the reorganization plan ultimately adopted. This study included one alternative administrative unit involving component districts of Administrative Unit 12; this suggested unit in the study grouped Chester Township and Upland with Penn-Delco (currently Administrative Unit 14) to form one administrative unit. (Ex. P–14)

71. Plaintiffs introduced no evidence that the county and state boards had feasible alternative plans which would have lessened the black student concentration in Unit 12.

At the trial of this case in November, 1973, plaintiffs presented two witnesses who dealt with the issue of alternative reorganization plans to that adopted in Delaware County in 1968. Dr. John W. Strickler, Associate Professor of Education at the University of Miami and Associate Director of the Florida School Desegregation Consulting Center, suggested several administrative units that might possibly have been considered as alternatives to Unit 12, and to Units 4

and 5, the two other units challenged in this case.

First, he said that Units 4, 5, and 6 might have been combined, resulting in a total student population of 17,167 and a black student population of 2,228, or a black student percentage of 12.97%. (N.T. 235)

Another alternative, he said, might have been to combine Units 3 and 4, for a total student population of 17,867 and a black student population of 1,029, or a black student percentage of 5.75%. (N.T. 235)

As to alternatives involving Unit 12 or its component districts, Dr. Strickler said that Unit 12 might have been combined with Unit 11, for a total student population of 8,217, or a black student percentage of 48.4%. (N.T. 237, 238)

Another possibility, he said, would have been to include Unit 12 with Units 15, 14, and 11, for a total student population of 24,469 and a black student population of 8,761, or a black student percentage of 35.8%. (N.T. 238)

Dr. Strickler emphasized, however, that his suggestions as to alternative administrative units had been calculated in rapid fashion and were offered merely as suggested units that might possibly have been considered, and were not meant to be recommendations.

To offer recommendations for reorganization, he said, he would need more data than he had in formulating the alternatives he suggested at trial. He acknowledged that he had based these alternative suggestions on statistics furnished him concerning total student populations and black concentrations, and that in one case he did not know even these figures for one of his suggested alternatives.

He acknowledged also that he neither had visited the schools in the districts in question, nor reviewed their curricula, nor did he know either the distances spanned by his suggested alternative administrative units, or the locations of the white and black populations within

these suggested units. This was the type of information, he said, which he would need to make recommendations rather than mere suggestions. (N.T. 234, 236, 245, 249, 262, 281)

Another witness for plaintiffs, Mr. Richard Anliot of the Human Relations Commission's Division of Education, testified simply that he believed there were reasonable alternatives to the reorganization plan adopted by Delaware County in 1968. Some of these alternatives, he said, were contained in Exhibit P–14, which the Delaware County School Board had compiled, but this exhibit did not exhaust the possible alternatives.

The testimony of neither Strickler nor Anliot, however, nor any other evidence offered by plaintiffs, dealt with the economic or administrative feasibility of alternatives to Unit 12 or the 1968 Delaware County reorganization plan. Nor does their testimony indicate they considered factors of economic or administrative feasibility in reaching their respective conclusions as to alternatives. Strickler expressly indicated as noted above, that he had not considered a number of matters related to the economic and administrative feasibility of alternatives. Anliot similarly testified that he had not considered the locations of black and white populations within the component districts of the units in question. (N.T. 117, 118, 160)

72. Defendant offered one witness, Clyde Dalton, Executive Director of the Delaware County Intermediate Unit, who testified *inter alia* as to several reasons the County School Board had chosen to combine Chester City and Chester Township. First, he said, Chester Township students had traditionally attended high school in Chester City.

Second, Units 14 (Penn-Delco) and 13 (Chichester), the only areas other than Chester City contiguous to Chester Township, were both poorer than Chester City in terms of market value of taxable real estate per student.

Third, he said, there was no need to help Chester City by merging it with

any of the larger units contiguous to it. The need, he said, was rather to help the districts contiguous to Chester. (N.T. 307, 308)

Other than the above testimony of Mr. Dalton that Units 14 and 13 were poorer than Chester City in terms of market value per student, defendants offered no testimony as to the economic and administrative feasibility of alternative reorganization plans and placements of Chester City and Township.

73. Prior to reorganization the school districts of Chester and Chester Township and the County Board were each issued a publication titled "Desegregation Guidelines for Public Schools" and a companion document titled "Recommended Elements of a School Desegregation Plan", which were promulgated jointly by the Department of Public Instruction, now known as the Department of Education, and the Pennsylvania Human Relations Commission, and which were disseminated to those school districts which had been requested by the Department of Public Instruction and the Commission to submit desegregation plans. (N.T. 42, 43 Ex. P–41, 42) These documents set forth policy guidelines for dealing with segregation in the public schools. The Delaware County Board itself received copies of both documents. (N.T. 43)

These guidelines provide *inter alia*:

"Any action, direct or indirect . . . which fosters racial segregation in the public schools, is against the public interest, and should not be taken by any public agency. Whenever any such action, past or present, has adversely affected public education, it is the responsibility of public school authorities to correct it, forthwith." (Ex. P–41)

74. It is unclear whether the above-mentioned guidelines were meant to apply not only to the formula of desegregation plans by individual districts or school authorities ordered to submit such plans, but also to the formulation of reorganization plans by county boards

under the mandate of Act 150, which was unrelated to the matter of segregation. The guidelines themselves shed no light on this question, and while Richard B. Anliot, the Director of the Division of Education of the Human Relations Commission expressed his opinion that the guidelines did apply to reorganizations under Act 150, he acknowledged on cross-examination that the Human Relations Commission had not specifically authorized him to make such a representation. (N.T. 134–135).

75. Prior to reorganization, the general counsel of the Human Relations Commission met with the Delaware County School Board to discuss the proposed merger of Chester City with Chester Township. (N.T. 188). The record indicates that at this meeting the general counsel of the Human Relations Commission at least voiced questions about the advisability of the proposed merger, although the record does not indicate whether he said the Human Relations Commission would oppose such merger, or whether this was in fact ever the Commission's position. (N.T. 27).

76. Subsequent to and apparently as a result of this meeting between counsel for the Human Relations Commission and the Delaware County School Board, the State Superintendent of Public Instruction forwarded to each County Superintendent a letter explaining the meaning of the last sentence of paragraph 7(c) of the Standards for Approval of Administrative Units. (Ex. P–2, N.T. 83–99, see above Finding of Fact.) As noted above, the letter stated:

" . . . . Please be advised that the intent of the language of the last sentence of this paragraph was to prevent de jure segregation, through the fixing of school district boundaries, whether for racial, religious, social or economic reasons." (N.T. 83, Ex. P–43)

77. In 1967–68, prior to reorganization, the full-time professional staff of Chester City was 39.3% black. The comparable figure for Chester Township

was 65.6%. The figure for Upland was 0%. (Ex. P–39).

78. The combination of these districts into Administrative Unit 12 produced a unit with a full-time professional staff 39.2% black, the highest percentage of any unit in the county. (Ex. P–39)

79. The full-time professional staff of Delaware County as a whole in 1967–68, prior to reorganization, was 7.7% black. (Ex. P–39).

80. The black percentages of the full-time professional staffs, based on 1967–68 figures, for the units contiguous to Administrative Unit 12 were respectively as follows: Chichester (Unit 13)—4.3%; Penn-Delco (Unit 14)—0%; Wallingford-Swarthmore (Unit 11)—.8%; Ridley (Unit 7)—.3%.

81. As of 1972–73, the black percentages of the time professional staffs of the several areas mentioned in the preceding findings were as follows: Administrative Unit 12—38.7%; Delaware County—7.6%; Chichester (Unit 13)—3.1%; Penn-Delco (Unit 14)—0%; Wallingford-Swarthmore (Unit 11)—3.2%; Ridley (Unit 7)—.7%. (Ex. P–39).

82. As noted above, Chester Township's students had traditionally attended Chester City High School on a tuition basis, and had in fact at one point successfully gone to court to enforce their interest in attending Chester City High School.

83. Administrative Unit 12 had the second highest total market value of taxable real estate of all administrative units established under the 1968 reorganization plan. (Ex. P–18).

84. The total market value of taxable real estate within Unit 12, however, declined between 1966 and 1970 from $184,884,800 to $174,869,900. (Ex. P–12, 15)

85. Despite its total market value ranking, however, as of 1970–71 Unit 12 had a ratio of total market value per student of $12,781, the lowest of all

units in the county. The ratios for Chester City, Chester Township, and Upland individually were respectively $13,017, $13,085, and $9,383. (Ex. P–17, P–18)

86. The economic effort of a school district or administrative unit, however, is not a function solely of market value per student. State and federal subsidies must also be considered. (N.T. 322, 323)

87. Administrative Unit 12 has the second highest net total budgeted appropriations per pupil of all administrative units in Delaware County. (Ex. D–4)

88. Administrative Unit 12 has the highest per pupil budgeted expenditure for guidance related services to pupils of all school districts in Delaware County. (Ex. D–5).

89. Administrative Unit 12 has the highest per pupil expenditure for budgeted instructional services to pupils of all school districts in Delaware County. (Ex. D–5).

90. In 1967–68, 22.3% of the students of Administrative Unit 12 were designated as "educationally deprived" and thus entitled to compensatory education grants from the federal government and Secondary Education Act. This designation is made to pupils from families with incomes less than $2,000, pupils from families receiving aid to families of dependent children, pupils from foster homes, or pupils residing in institutions for neglected and delinquent children. (N.T. 61, 64, Ex. P–37).

91. The educationally deprived pupils within Administrative Unit 12 constituted 45.2% of the educationally deprived children within the entire Delaware County. (N.T. 67).

92. The percentage of educationally deprived pupils in 1968 within Delaware County as a whole was 5.7%. (Ex. P–37)

93. As of 1972–1973, the percentages of educationally deprived children within Unit 12 and Delaware County was 53.5% and 10.5 %. (Ex. P–37)

94. The median family income as of 1970 in Delaware County was $11,822, while in Chester City it was $8,511, Chester Township $9,812, and Upland $9,886. The County average was $18,822. Of the forty-nine (49) municipalities in Delaware County, in terms of family income Chester City ranked 48th, Chester Township 42nd, and Upland 41st. Unit 12 overall ranked in the lower third of all county administrative units. (Ex. P–32)

95. As of 1970, Chester City had a median value of housing units of $10,000. The comparable values for Chester Township and Upland were respectively $16,800 and $12,600.

96. The comparable median value for the county overall was $17,800.

97. In terms of the relative rankings of the forty-nine (49) municipalities in Delaware County, on the basis of the above median value Chester City ranked 43rd, Chester Township 26th and Upland 39th. (N.T. 226, Ex. P–26, P–32).

98. Chester City has 50.2% of all public assistance recipients in Delaware County. (Ex. P–40)

99. As of 1970, 22.5% of all black residents of Chester City between the ages of 16 and 21 were not high school graduates. The percentage for blacks in other areas of Delaware County was 14.9%. (N.T. 228, Ex. P–33)

100. The median years of school completed by black residents of Chester City between the ages of 16 and 21 of 1970 was 9.9 years. For blacks in the balance of Delaware County, the figure was 11.2 years. (Ex. P–33, N.T. 229)

101. The median school years for all Chester City Residents, black and white, as of 1970 was 10.2 years. For all of Delaware County, the comparable measure was 12.4 years for males, 12.2 years for females. (N.T. 230, Ex. P–59).

*Administrative Unit 4.*

102. As noted above, under the 1968 Delaware County Reorganization Plan, Administrative Unit 4, otherwise known as the William Penn District, was formed from a merger of the Darby-Colwyn, Lansdowne-Aldan, and Yeadon School Districts. (Stipulation 1, Ex. P–10).

103. At the time of the above merger, the student population of the Darby-Colwyn district was 22.1% black, while that of the Yeadon district as 34.2% black, and that of the Lansdowne-Aldan district was 2.7% black. (P–37).

104. The 1968 merger produced in Administrative Unit 4 a student population of 16% black. (Ex. P–37).

105. The student population of Administrative Unit 4 had decreased to 12.6% black by 1972–73. (Ex. P–37).

106. As noted above, in 1965, under reorganization pursuant to Act 299, the Delaware County School Board's original proposal had placed the Darby-Colwyn district in Administrative Unit 5, but the State Board of Education had taken Darby-Colwyn out of Unit 5 and placed it in Unit 4. (N.T. 304, Ex. P–9).

107. The Darby-Colwyn School Board approved its district's placement in Unit 4 in 1968. (N.T. 304).

108. Under the 1968 Delaware County plan, the Delaware County School Board created Administrative Unit 4 contiguous to Units 3 and 5.

109. Under the 1968 plan, Unit 3, the Upper Darby Unit, had a student population .1% black in 1968, and Unit 5, the Southeast Delco Unit, had a student population 19.8% black. (Ex. P–10, P–37).

110. The percentages of blacks within the full-time professional staffs of Unit 4 and its contiguous units were in 1968 and 1972 respectively:

|  | 1968 | 1972 |
|---|---|---|
| Unit 4: | 5.3% | 5.7% |
| Unit 5: | 20.5% | 17.0% |
| Unit 3: | .7% | .5% |
| | (Ex. P. 39) | |

111. As to alternatives to Unit 4, plaintiff offered only the testimony of Dr. Strickler and Mr. Anliot, referred to above in connection with Unit 12 (see

Finding of Fact 71). As in his testimony as to Unit 12, Dr. Strickler testified as to Unit 4 only that the County Board might have considered some possible alternative reorganizations involving Unit 4. He mentioned, for example, combining Units 4, 5, and 6, which would have given a total student population of 17,167, and a black student population of 2,228 or 12.97% (N.T. 235). He mentioned also possibly combining Units 3 and 4, which would have produced a total student population of 17,867, and a black student population of 1,029 or 5.-75%. (N.T. 235, 236).

112. As noted above, however, Dr. Strickler pointed out that he suggested these combinations only as possibilities, and not as recommendations, which he could make only with more information. He admitted on cross-examination that he had no knowledge of the size of Unit 4, nor of its tax structure or rate, nor of the unit's financial resources other than from his reviewing the unit's total market value per student. Similarly, he had no knowledge of whether the unit's children were bussed or walked to school, nor the number of school buildings in the unit or their condition, nor of the composition, quantity, and academic background of the unit's staff. (N.T. 264, 265, 266, 267).

113. Plaintiffs offered no evidence concerning the economic or administrative feasibility of alternative reorganizations involving Unit 4.

114. Defendants offered the testimony of Clyde Dalton, the Executive Director of the Delaware County Intermediate School Unit, that the County and State Boards had considered at least thirteen (13) or fourteen (14) different combinations of the districts eventually involved in Units 4, 5, and 6 prior to deciding upon the plan adopted. (N.T. 305). Mr. Dalton did not indicate, however, what the different combinations considered were. Defendants offered no other evidence concerning the availability or lack of alternative reorganization plans involving Unit 4 or its component districts, and specifically no other testimony or evidence concerning the relative economic or administrative feasibility of such plans.

115. Administrative Unit 4 ranked third, under 1966 data, in total market value of taxable real estate of units established under the 1968 reorganization. (Ex. P–18).

116. The total market value of taxable real estate within Unit 4 increased between 1966 and 1970 from $154,299,-500 to $173,994,800. (Ex. P–18).

117. Unit 4 had, as of 1970–71, the sixth highest ratio of market value per student, weighted by grade level, of all units in the county. (Ex. P–17)

118. Unit 4 is not a racially identifiable school unit, either as to neighboring units or the county as a whole.

*Administrative Unit 5*

119. As noted above, Administrative Unit 5 ("Southeast Delco") was formed by combining the school districts of Darby Township, Collingdale, Folcroft and Sharon Hill. (Ex. P–12).

120. At the time Unit 5 was formed, its component districts had the following total student populations, black students, and percentage black student populations:

Darby Township:
| | | |
|---|---|---|
| Total | : | 1744 |
| Black | : | 1190 |
| % Black: | | 68.2% |

Collingdale Borough:
| | | |
|---|---|---|
| Total | : | 1574 |
| Black | : | 4 |
| % Black: | | .3% |

Sharon Hill Borough:
| | | |
|---|---|---|
| Total | : | 1263 |
| Black | : | 6 |
| % Black: | | .5% |

Folcroft Borough:
| | | |
|---|---|---|
| Total | : | 1466 |
| Black | : | 0 |
| % Black: | | 0% |

(Ex. P–37)

121. The combination of the above districts into Unit 5 produced a unit with a total student population of 6,047, and a black student population of 1,200 or 19.8% (Ex. P–37).

122. Under the 1968 reorganization, Unit 5 was contiguous to Units 4 (William Penn), 7 (Ridley), and 6 (Interboro). (Ex. P–10).

123. At the time of reorganization in 1968, these units contiguous to Unit 5 had total student populations and black student populations in the following amounts:

```
Unit 4:
    Total    :    6,360
    Black    :    1,015
    % Black:        16.0%
Unit 6:
    Total    :    4,770
    Black    :      13
    % Black:         .3%
Unit 7:
    Total    :    8,295
    Black    :     243
    % Black:        2.9%
```

124. The percentages of blacks within the full-time professional staffs of Unit 5 and its contiguous units in 1968 and 1972 were respectively:

|          | 1968   | 1972   |
|----------|--------|--------|
| Unit 5 : | 20.5%  | 17.0%  |
| Unit 4 : | 5.3%   | 5.7%   |
| Unit 6 : | 0%     | 0%     |
| Unit 7 : | .3%    | .7%    |
|          |        | (Ex. P–39) |

125. As to possible alternative reorganization involving Unit 5, plaintiffs offered only the testimony of Dr. Strickler and Mr. Anliot, referred to above. (See Findings of Fact 71 and 111). Strickler testified that the same limitations as to his knowledge of Unit 4 existed as to his knowledge of Unit 5. (N.T. 286)

126. On this issue of alternatives reorganization of Unit 5 or its component districts, defendants offered the testimony of Mr. Dalton, referred to above (See Finding of Fact 72), that the County and State Boards had considered different combinations of the districts ultimately involved in Units 4, 5, and 6. With respect to Unit 5 alone, Mr. Dalton also testified that the Chester Pike area, located within Unit 5, presented one of the more difficult prob-

lems the County Board encountered in devising its 1968 reorganization plan. He did not explain, however, the nature of the problem this area presented. (N.T. 305). Defendants offered no other testimony or evidence concerning alternative reorganization plans involving Unit 5, and specifically no other testimony or evidence concerning the relative feasibility of alternative plans.

127. Darby Township consists of two sections, with the black population in the section on the southeast corner of Unit 5, and the white population in the unit's northwest corner. (Ex. P–10, N. T. 305, 306).

128. The Darby Township's School Board had requested placement in Unit 5. (N.T. 306).

129. Prior to Delaware County's School reorganization in 1968, the Human Relations Commission had ordered the Darby Township District to submit a desegregation plan. Subsequently, citizens within that district brought suit for more immediate desegregation, which the court in which such suit was brought ultimately ordered, and the segregation within that school district was corrected. (N.T. 123, 124).

130. Unit 5 ranked fourth, under 1966 data, in total market value of taxable real estate of the units established under the 1968 plan. (Ex. P–18).

131. The total market value of taxable real estate within Unit 5 increased between 1966 and 1970 from $119,235,-600 to $125,655,550. (Ex. P–18).

132. Unit 5 ranked thirteenth, as of 1970–71, of all county units in terms of the ratio of total market value of taxable real estate per student, weighted by grade level. (Ex. P–17)

133. Unit 5 is not a racially identifiable school unit, either as to neighboring units or the county as a whole.

*Additional Findings.*

134. Under the reorganization pursuant to Act 299, prior to the reorganization in 1968 under Act 150, the Dela-

ware County Board of School Directors had merged Media's district, with the student population roughly 15% black, with three other districts with virtually no black student populations, to form Administrative Unit 10, with a student population 6% black. (Ex. P–19, N.T. 300)

135. Under the same reorganization pursuant to Act 299, the Delaware County Board merged the Upper Chichester district, with the student population 8% black containing 900 black students, with three other districts which contained cumulatively 250 black students and 9000 students total, to form Unit 13 with an 8% black student population. (Ex. P–16, N.T. 300)

136. Under the reorganization in 1968 pursuant to Act 150, the county board had combined the Morton District with a student population of 27% black, with the Springfield District with a .1% black student population to form Unit 8, with a 4% black student population. (Ex. P–19, N.T. 301)

137. Under the same reorganization in 1968, the county board had combined the Nether-Providence District, with 715 blacks or a student population 5% black, with three other districts containing cumulatively only 230 blacks and 8000 students overall, to form Unit 11, with a student population 5.5% black. (Ex. P–19, N.T. 301, 302)

138. In adopting the 1968 plan of reorganization, and specifically in forming Units 4, 6, and 12, the evidence does not show the county and state boards more likely than not acted with either segregative intent or intent or purpose to discriminate economically against any class.

139. The 1968 reorganization for Delaware County, including the formation of Units 4, 5, and 12, and the tax system adopted by the Interim Operating Committees in those units, are rationally related to the state's interest in providing a basic education for every child, permitting and encouraging local participation and control of schools through district taxation, and attempting responsibly to arrive at practical and workable solutions to educational problems.

*Administrative and Judicial Challenges to the 1968 Reorganization Plan Prior to this Action.*

140. In accordance with the statutory procedure (24 P.S. § 2400.3), the component school districts of Lansdowne, Aldan, East Lansdowne, Yeadon, Collingdale, Folcroft, Sharon Hill, Millbourne, Swarthmore-Rutledge, City of Chester and Upland considered themselves aggrieved and demanded and were granted hearings before the State Board of Education. After hearings at which testimony and exhibits were presented in which the appellant school districts sought to have the plan amended as to their assignment in the plan, the State Board of Education by Adjudications dated May 9, 1969 denied the appeals and approved the Plan of Reorganization of the Delaware County Board of School Directors. (Stipulation).

141. Each of the foregoing component school districts in turn appealed, as permitted by statute (24 P.S. § 2400.5), to the Court of Common Pleas of Delaware County. These appeals were respectively:

| | |
|---|---|
| Chester School District | No. 7255 of 1969 |
| Upland School District | No. 7256 of 1969 |
| Collingdale School District | No. 7639 of 1969 |
| Folcroft School District | No. 7588 of 1969 |
| Sharon Hill School District | No. 7589 of 1969 |
| Millbourne School District | No. 7731 of 1969 |
| Lansdowne Aldan Joint School District | No. 7257 of 1969 |
| Yeadon School District | No. 7453 of 1969 |
| Swarthmore Rutledge School District | No. 7519 of 1969 |

142. The appeal petitions alleged that the State Board approval of the County Plan was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. It was also contended that Act 150 was unconstitutional as special legislation and was illegal be-

cause the time limits set forth in the Act for reorganization had already expired. The State Board of Education argued that only taxpayers could challenge the constitutionality of Act 150. (Stipulation)

143. The appeals were heard by the Honorable Henry G. Sweney, President Judge. Original opinions were entered February 24, 1970 and a supplemental Opinion was filed May 24, 1970. By Final Decrees dated February 24, 1970 the Court dismissed all appeals and sustained the approval by the State Board of Education of the Delaware County Plan. (Stipulation)

144. Appellant School Districts then all appealed to the Supreme Court of Pennsylvania which transferred the cases to the Superior Court of Pennsylvania. See Plains Township School District Appeal, 438 Pa. 294, 265 A.2d 358 (1970); of Edgewood Borough School District Appeal. 445 Pa. 343, 347–8, 285 A.2d 880 (1971). After argument, the Superior Court affirmed the decrees and judgments of Judge Sweney, per curiam, 217 Pa.Super. 793–797 (October 2, 1970). All Appellant School Districts then filed applications for allocator in the Supreme Court of Pennsylvania. Allocators in all cases were refused. (See 219 Pa.Super. lxx). (Stipulation)

145. Clyde E. Dalton, then as County Superintendent of Schools, proceeded to call conventions of school directors of the reorganized school districts as required by statute (24 P.S. § 2400.8, 24 P.S. § 3–303.1) to be held in early February of 1971. Swarthmore-Rutledge and Nether Providence did, in fact, convene and form the Wallingford-Swarthmore District (Unit 11). At this juncture four taxpayers' suits were filed in the Court of Common Pleas of Delaware County to enjoin the conventions on the grounds that the School Reorganization Act (Act 150) had been declared unconstitutional by the Court of Common Pleas of Crawford County and that deci-sion was then on appeal to the Superior Court. The cases were:

| | |
|---|---|
| Hubaj, et al v. Dalton, et al (Unit 12) | No. 1200 of 1971 |
| Simione, et al v. Dalton, et al (Unit 3) | No. 1432 of 1971 |
| Oravis, et al v. Dalton, et al (Unit 5) | No. 1263 of 1971 |
| Lee, et al v. Dalton, et al (Unit 11) | No. 1640 of 1971 |

By Orders entered February 5, 1971 (Reed, J.) preliminary injunctions were issued enjoining the respective conventions. When the Superior Court reversed the Crawford County Court and again declared the School Reorganization Act constitutional, Cambridge Springs Borough School District Appeal, 219 Pa.Super. 28, 275 A.2d 840 (1971), the Court of Common Pleas of Delaware County by Orders dated March 31, 1971 dissolved the preliminary injunctions and dismissed the foregoing Complaints in Equity. (Stipulation)

146. Thereupon, several unreorganized school districts, including some which favored reorganization, filed complaints in equity alleging that due to lateness of time, reorganization should not become effective until July 1, 1973. These suits in the Court of Common Pleas of Delaware County were:

| | |
|---|---|
| Millbourne | No. 3685 of 1971 |
| Upper Darby | No. 3993 of 1971 |
| Upland | No. 3749 of 1971 |
| Lansdowne Aldan | No. 3743 of 1971 |
| Yeadon | No. 3844 of 1971 |
| Collingdale | No. 3644 of 1971 |
| Folcroft and Sharon Hill | No. 3686 of 1971 |

After testimony and Argument the Court by Orders dated April 20, 1971 dismissed the School Districts' Complaints in Equity. (Stipulation)

147. The County Superintendent then called the respective component school districts into convention according to law. Millbourne, Clifton Heights and Upper Darby, did, in fact, organize Unit 3 into the Upper Darby School District. All other units, however, while meeting in convention, did not reorganize but deferred action until December, 1971. In accordance with the Reorgani-

zation Act, Mr. Dalton called second conventions with the same inaction a result. He then prepared to apply to the Court of Common Pleas to have the Court appoint the respective Interim Operating Committees in Units 4, 5 and 12. This was in pursuance of the Statute to the effect:

"If all remaining members are not selected at such second convention the court of common pleas of the proper county, upon the petition of the county superintendent of schools, shall within thirty days appoint to the interim operating committee, from the incumbent school directors, the remaining member or members and specify their terms." (24 P.S. § 3-303.1) (Stipulation)

148. Another taxpayers' suit was filed by residents of the Boroughs of Millbourne alleging certain illegalities in the formation of Unit 3 (Upper Darby, Clifton Heights and Millbourne). This case was Simione et al v. Clyde E. Dalton, et al., No. 5788 of 1971. The Complaint averred that the ratios of assessed value to market value of real estate for tax purposes in the three component districts were different and that the proposed levying of a uniform school tax millage in all three districts would be illegal because (1) contrary to Act 154 of 1970 (24 P.S. § 6-672.1) and (2) in violation of Article VIII Section 1 of the Pennsylvania Constitution and the Equal Protection Clause (14th Amendment) of the United States Constitution. The Court (Reed, J.) relying on 24 P.S. Section 6-672.1, on June 18, 1971, ordered the Interim Operating Committee to equalize taxes by levying of millage rates consistent with assessment ratios. On June 30, 1971, State Senate Bill 787 of 1971 was signed into law, effective immediately, which bill deleted from 24 P.S. Section 6-672.1 the foregoing requirement for tax equalization. Judge Reed was notified of this action by the Solicitor for the County Board and pursuant to the Solicitor's request, an ex parte amended order was issued, rescinding the requirement for tax equalization. Judge Reed made no specific finding on the Constitutional attack. (Stipulation)

149. As Administrative Units 4, 5 and 12 did not implement the School District reorganization orders, the Secretary of Education sent letters under date of July 2, 1971, to all former component districts advising that the component districts went out of existence June 30, 1971, and could transact no business. (Stipulation)

150. At or about the time that the Simione action was brought, Swarthmore taxpayers instituted an action in the United States Federal Court for the Eastern District of Pennsylvania, alleging, inter alia, that unequal taxation would result in the consolidated district because of the existence of unequal assessment ratios in the components of the district. Lee, et al. v. Aaron et al, Civil Action No. 71-1156. The Federal Court, by order dated June 22, 1971, held that this was not a violation of due process under the United States Constitution since "the Public School Code of 1949, 24 P.S. Section 6-672.1 provides for the adjusting and equalization of taxation in situations identical to that presented by Plaintiff." 24 P.S. Section 672.1 has since been, as it related to tax equalization in such situations, repealed. (Stipulation)

151. On July 14th, 1971, all of the component districts joined in filing a Petition for a Declaratory Judgment asking the Court of Common Pleas of Delaware County,

(1) To declare that the Component districts continue as separate districts until June 30, 1972 and that Units 4, 5 and 12 be deemed established as of July 1, 1972; and

(2) Affirm the validity of 1971-72 budgets and tax levies which the component districts had adopted; and

(3) Directing Clyde E. Dalton to call conventions of school directors in the

units in December, 1971. (Stipulation)

152. A Rule was allowed and copy served on the Secretary of Education. On the return day, with the concurrence of Solicitors for all the component school districts, the Deputy Attorney General and Counsel for the Executive Director of the Delaware County Intermediate Unit, the Court of Common Pleas (Catania, J.) did enter a decree to No. 7432 of 1971 of July 28, 1971 (Similar Decrees were entered to No. 7676 and 7677 of 1972 on petitions filed on behalf of the School Districts of Colwyn and of Darby) granting the prayer of the Petition. (Stipulation)

153. On December 17, 1971, a class action was initiated in the Court of Common Pleas of Delaware County, No. 13358 of 1971, captioned Cleary, et al, Plaintiffs vs. Dalton, et al, Defendants. Donald J. Orlowsky, Esquire, attorney for plaintiffs in the case at bar, also served as attorney for the plaintiffs in *Cleary*. The Plaintiffs in *Cleary*, as in the case at bar, were certain taxpayers and parents living in Administrative Units 4, 5 and 12, who brought their suits in their own stead, as parents and natural guardians of their respective children, and on behalf of other taxpayers, resident parents and their public school children similarly situated.

154. Defendants in the *Cleary* case were Clyde Dalton, Executive Director of the Delaware County Intermediate Unit, the Board of School Directors of the Delaware County Intermediate Unit, and the Interim Operating Committees of Administrative Units 4, 5 and 12.

155. The Plaintiffs in *Cleary* contended *inter alia* that the Delaware County reorganization plan resulted from arbitrary decisions by state and local officials based on outdated, inaccurate data, and that the plan as applied to the plaintiffs created serious racial and economic imbalance, thereby depriving plaintiffs of equal protection of the laws and equal educational opportunities. The heart of Plaintiffs' challenge to the reorganization plan on economic imbalance grounds was that under the plan, different tax rates and assessment ratios would apply in the various school districts, thereby requiring some parents to bear a heavier economic burden than other parents for the education of their children. (Res Judicata Stipulation, Part VIII)

156. On June 21, 1972, in an opinion by Judge Bloom, the Court of Common Pleas of Delaware County denied the relief requested by the plaintiffs. On the racial imbalance issue, the Court reasoned that the decisions of the state and county education officials as to reorganization were "administrative" decisions, and hence were reviewable only for abuse of discretion, caprice, or bad faith. The Court then held that it could not say the state and county boards had abused their discretion in devising the reorganization plan in question. In reaching this latter conclusion, the Court noted that it believed the racial imbalance question about the reorganization plan had been raised and litigated in the earlier appeals of the plan from the State Board to the Delaware County Common Pleas Courts, and that the decision of the Common Pleas Court upholding implementation of the plan constituted an adjudication of the racial imbalance issue against plaintiffs' contentions. (Res Judicata Stipulation; Part III, pp. 16, 17)

157. On the economic imbalance issue, the Court reasoned that any differences between the ratios of assessed value to market value among the component municipalities was not a result of the reorganization plan, or a responsibility of the school authorities, but lay rather within the province of the County Board of Assessment Appeals. (Res Judicata Stipulation, Part III, pp. 18–20)

158. On November 30, 1973, an unperfected appeal before the Commonwealth Court of Pennsylvania was discontinued by Donald J. Orlowsky, counsel for the plaintiffs.

## DISCUSSION

*Res Judicata.*

Defendants contend that the decision of the Delaware County Court of Common Pleas in Cleary v. Dalton, noted above, bars our deciding this case, under the principle of res judicata. With all due respect, we cannot agree.

■ The doctrine of res judicata operates to bar decision by a court of a cause of action or claim which another court of valid jurisdiction has already decided. Grubb v. Public Utilities Commission of the State of Ohio, 281 U.S. 470, 50 S.Ct. 374, 74 L.Ed. 972 (1930); Angel v. Bullington, 330 U.S. 183, 67 S. Ct. 657, 91 L.Ed. 832 (1947). While *Cleary* involved the same parties as the instant case, and while plaintiffs raised in their complaint in that action the federal constitutional and statutory claims they raised here, the court in *Cleary* very clearly did not decide those claims. As noted above, the court in *Cleary* approached the case solely in terms of judicial review of an administrative decision, in this case the decision of the state and county boards. Applying general principles of such review, the court decided that the boards had not abused their discretion; that is, the court found no bad faith, capricious action or abuse of power. At no point in its opinion did the Court even mention the federal constitutional and statutory issues plaintiffs had raised, much less discuss or attempt to decide these issues.

We simply cannot conclude that such disposition of the *Cleary* action operates to bar plaintiffs' asserting their federal claims in the action now before us. These claims, and the issues they involve, are not frivolous. Indeed, they raise questions of utmost importance in an area of law as yet far from settled. In short, these issues merit actual treatment and decision before a court may bar plaintiffs from raising them on grounds of res judicata. For the reasons stated above, we do not believe *Cleary* constituted such treatment and

decision, and we thus conclude that *res judicata* does not bar the assertion and decision of these issues before this Court.

*Standing on the Racial Segregation Issue.*

■ As we held in our opinion of May 22, 1973, the named plaintiffs, even though white, have standing to bring this action alleging unconstitutional racial segregation in violation of the Civil Rights Act of 1964, 42 U.S.C. § 1983.

In our opinion of the above date, we held that plaintiffs had standing because they could represent the interests of blacks whose rights the school reorganization had allegedly violated. Plaintiffs have standing, however, for a more fundamental reason. If the school reorganization produced unconstitutionally segregated schools in the school districts where plaintiffs reside, then apart from violating the rights of blacks within those districts, this reorganization violated as well the rights of plaintiffs, or more properly plaintiffs' children, themselves. As the Court held in Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686, 98 L.Ed. 873 (1954), a segregated school is an inherently inferior school, and presents the danger of educational and psychological harm to the students who attend it. Although the Court in *Brown* dealt with claims by black students forced to attend all black schools, a school need not be entirely black to be segregated, and we can see no reason why the Court's holding and reasoning in *Brown* does not apply as readily to white students who must attend an unconstitutionally segregated school.

Accordingly, we reaffirm our earlier decision that plaintiffs have standing in this case to challenge the allegedly unconstitutional segregation of the school units in question in this case.

*The Racial Segregation Claims.*

We have here one of the so-called "northern" line of school segregation

cases, involving no state statute compelling or permitting segregation, but in which plaintiffs contend that unconstitutional racial school segregation has nevertheless occurred. We note at the outset that we approach this decision only after the most thorough consideration, and with a full awareness of the difficult and as yet uncharted area of the law involved.

At the present time, the leading authority for the law governing this type of case remains the Supreme Court's 1973 decision of Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L. Ed.2d 548, involving alleged segregation within Denver, Colorado's school system. The Court noted that Denver's system had never been operated under a constitutional or statutory provision mandating or permitting racial segregation, but plaintiffs argued that unconstitutional segregation nonetheless existed as a result of the Denver School Board's "manipulation . . . [of] attendance zones, schoolsite selection, and a neighborhood school policy." 413 U.S. at 191, 93 S.Ct. at 2689.

The district court found that plaintiffs had proven a case of intentional segregation as to the schools in Denver's northeast or "Park Hill" area, and accordingly ordered desegregation of these schools. 303 F.Supp. 279, 289 (D.C. Colo.1970), and 313 F.Supp. 61, 64–69 (D.C.Colo.1970). The district court then held, however, that its finding as to segregation in the northeast Denver schools did not of itself require desegregation of the schools in Denver's "core city" area, and that plaintiff's proof of intentional segregation in the northeast schools had no bearing on the issue of segregative intent as to the core city schools. The Court then held that plaintiff had failed to prove such intent as to these latter schools, 313 F.Supp. 61, 73 (D.C.Colo.1970), and the Court of Appeals subsequently affirmed. 445 F.2d 990 (10th Cir. 1971).

In reversing and remanding, the Supreme Court preliminarily held that with respect to a school system where segregation was not mandated by state law, the particular facts of the case, rather than any particular percentage of minority concentrations within the system's schools, would determine whether the system contained a segregated condition. 413 U.S. at 195, 196, 93 S.Ct. 2686.

The Court then held that, first, as to whether a segregated condition in a school system violated the Fourteenth Amendment's Equal Protection Clause,

". . . where no statutory dual system has ever existed, plaintiffs must prove not only that segregated schooling exists but also that it was brought about or maintained by intentional state action." 413 U.S. at 198, 93 S.Ct. at 2692 (1973).

In addition, the Court held that unless the School Board could prove the northeast section of the city constituted a "separate, identifiable, and unrelated" section of the school system, 413 U.S. at 213, 93 S.Ct. 2686, a finding of segregation in the northeast area schools could serve as the basis for finding the entire school system unconstitutionally segregated, since the northeast schools constituted a "substantial" portion of the entire school system. 413 U.S. at 199–203, 93 S.Ct. 2686.

Moreover, the Court held that even if the School Board proved the northeast section was a separate part of the school system, the District Court's finding of intentional segregation in the northeast schools would shift the burden of proof to the school board as to the schools in the rest of the system, in which case the Board would have to prove either that their actions which caused segregation were not "to any degree motivated by segregative intent", or that even if their actions were so motivated, they did not "create or contribute" to the current segregated condition of the schools in question. 413 U.S. at 210, 211, 93 S.Ct. at 2698.

While all of the aspects of Keyes just highlighted are important to this

and all similar cases, the most important feature of *Keyes* is its requirement of a finding of segregative intent attributable to the state before a court may hold unconstitutional any segregation not the result of express state law. *Keyes* thus affirmed, albeit without expressly so doing, that line of lower court cases holding that neither mere statistical racial imbalance, nor segregation of the so-called "de facto" type, resulting from private housing patterns or other influences not involving intentional state action, constituted a violation of the Fourteenth Amendment's Equal Protection Clause. See, e. g., Bell v. City of Gary, Ind., 324 F.2d 209 (7th Cir. 1963); Downs v. Board of Education of Kansas City, 336 F.2d 988 (8th Cir. 1964); Deal v. Cincinnati Board of Education, 369 F.2d 55 (6th Cir. 1966). As the Court in *Keyes* itself said,

> "We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation . . . is *purpose* or *intent* to segregate." 413 U.S. at 208, 93 S.Ct. at 2697.

By the same token, this clear requirement under *Keyes* of a finding of intent renders inapplicable the principle, articulated in some lower court decisions dealing with alleged school segregation resulting from factors other than state law, that a violation of the Fourteenth Amendment arises merely where ". . . the natural and foreseeable consequences of actions taken by school authorities are to preserve segregation . . . or to hamper its removal . . . ." Hoots v. Commonwealth, 359 F.Supp. 807, 823 (W.D.Pa.1973). *Hoots* dealt, as does our case, with a county school reorganization under Act 150, and found a constitutional violation based on the "foreseeable consequence" test quoted above.

*Hoots,* however, was decided before the Supreme Court's decision in *Keyes,* and we respectfully suggest that, after *Keyes, Hoots* no longer constitutes the correct rule, at least to the extent *Hoots*

would allow a finding of constitutional violation absent an express finding of segregative intent. *Keyes* unmistakably requires such a finding as the courts after *Keyes* have consistently held. See, e. g., Soria v. Oxnard School District Board of Trustees, 488 F.2d 579 (9th Cir. 1973), where the Circuit Court reversed a district court's grant of summary judgment to plaintiffs in a school segregation case since the district court had failed to make an explicit finding on the issue of intent. See also, Higgins v. Grand Rapids Board of Education, 508 F.2d 779 decision of the 6th Circuit, December 6, 1974.

■ The courts have not, however, agreed on what "intent" under *Keyes* means. Specifically, the dispute centers on whether intent under *Keyes* involves the concept merely of willful action taken with foreseeable consequence, or whether intent under *Keyes* involves in addition the concept of "purpose".

The Court of Appeals for the Ninth Circuit has adopted the latter interpretation, equating intent with "purpose". In *Soria, supra,* where the district court in granting summary judgment had held irrelevant the issue of the motivation behind the governmental action that had allegedly increased racial imbalance in the schools, the Court of Appeals reversed and remanded under an interpretation of *Keyes* requiring for any finding of unconstitutional segregation a

> "determination that the school authorities had intentionally discriminated against minority students by practicing a deliberate policy of racial segregation." 488 F.2d at 585.

If *Soria* left any doubt as to the Ninth Circuit's position on the interpretation of the *Keyes* intent requirement, the subsequent decision of Johnson v. San Francisco Unified School District, 500 F.2d 349 (9th Cir. 1974) eliminated that doubt. In *Johnson,* the Court reaffirmed its decision in *Soria,* expressly stated that the district court in *Soria* had applied an erroneous legal standard in holding the issue of motivation irrele-

vant, 500 F.2d at 351, 352 and cited with emphasis a law review commentary which expressly interpreted *Keyes* to require a finding of segregative "purpose". 500 F.2d at 351, nt. 1.

On the other hand, the Second Circuit recently held that intent under *Keyes* requires only a showing of ". . . actions taken, coupled with omissions made, by governmental authorities which have the natural and foreseeable consequence of causing educational segregation." Hart v. The Community School Board of Education, New York School District #21, 512 F.2d 37, p. 50, (decided January 27, 1975). In reaching this decision, the court interpreted *Keyes* not to require a finding that the governmental action in question was motivated by a purpose or desire to discriminate. *Id.* at p. 50.

The *Hart* Court rested its decision on two reasons. First, the court suggested that to require more than a foreseeable consequence test for northern segregation cases would be to apply a more difficult standard for finding segregation unconstitutional in northern than in southern cases. Id., at pp. 49 and 51, citing Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L. Ed.2d 51 (1972).

Second, the *Hart* Court said that to require a finding of purpose or motivation in order to find school segregation unconstitutional would be to establish a standard "almost impossible of proof save by admissions." *Id.,* at p. 50.

Finally, the *Hart* Court attempted to distinguish the Ninth Circuit's position in *Soria* and *Johnson,* supra, by reading *Johnson* only to hold that the issue of intent must be specifically considered, but not to hold what intent means. *Id.* at p. 51.

With all due respect to the Second Circuit's decision in *Hart,* we believe its treatment of the Ninth Circuit's decision in *Johnson* does not accurately state the Ninth Circuit's holding in that case. We believe instead that the Ninth Circuit in *Johnson* and *Soria* clearly held

*Keyes* to equate intent with purpose or motivation. In support of this reading of *Johnson,* we need look no further than the Court's approval there of the law review commentary expressly interpreting *Keyes* in this fashion.

On balance, we believe the Ninth Circuit's interpretation of *Keyes* on the intent issue is the more correct one, and that segregative intent under *Keyes* means segregative purpose or motivation. In our view, the Supreme Court's language in *Keyes,* while perhaps not perfectly decisive of the issue, supports this interpretation more readily than the Second Circuit's contrary interpretation. As noted above, in summarizing the difference between de jure and de facto segregation, the *Keyes* Court expressly equated intent with purpose when it said:

> "We emphasize that the differentiating factor between de jure segregation and so-called de facto segregation . . . is *purpose* or *intent* to segregate." 413 U.S. at 208, 93 S.Ct. at 2697.

Moreover, given the facts of *Keyes,* an interpretation which equates intent with purpose would appear the more reasonable interpretation of the *Keyes* decision, since the record of governmental action in question rather clearly showed purpose or desire to segregate. Among other things, the record showed that after the Denver School Board had adopted resolutions for action which would have desegregated the Park Hill schools, a subsequently-elected Board majority which opposed the resolutions had promptly rescinded them and replaced them with programs that only perpetuated the segregation. 303 F.Supp. 279 (D.C.Colo.1969). In assessing this record, the Supreme Court itself expressly concluded that this record showed a policy of *"deliberate"* racial segregation. 413 U.S. at 192, 199, 93 S.Ct. 2686 (emphasis added).

Nor do we agree with the Second Circuit's argument in *Hart, supra,* that Wright v. Council of City of Emporia,

**1134**

407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), compels the conclusion that the Court in asserting the "intent" requirement in *Keyes* had in mind a standard which could be satisfied merely upon a showing of foreseeable segregative effect, but not segregative purpose or motivation. While *Wright* did hold proof of purpose irrelevant in that case in light of the showing of segregative effect, *Wright* involved a school system operating under an express state-enforced requirement of dual, segregated schools. 407 U.S. at 455, 92 S.Ct. 2196. The Court in *Keyes* expressly distinguished this type of segregated school system from the type involved in *Keyes* and the instant case, where the Court held a finding of intent was necessary to establish unconstitutionality. 413 U.S. at 198, 93 S.Ct. 2686.

Moreover, *Wright* involved an issue not of a de novo determination of liability, but rather the issue of compliance with a district court order to desegregate what the district court had determined to be an unconstitutionally segregated system. In such case, the issue is quite properly only whether the proposed remedy in effect complies with the court's order, and not with the purpose of the defendant in proposing the remedy.

Finally, we respectfully do not agree with the Second Circuit's argument that to equate intent with purpose would establish a standard provable only by admissions. Intent, even in the sense of purpose or motive, may readily be inferred in the proper circumstances, as the district court did in *Keyes* itself.

In short, we think the language and thrust of the entire *Keyes* opinion does not support the idea that the Court meant to allow actions of school officials to be held unconstitutional without regard to the purpose or aim behind those actions, but simply on the basis that those actions were taken voluntarily and with cognizance that they would not reduce existing segregated conditions. Such a position would hold school offi-

cials in violation of the Constitution for actions take solely for reasons of economic or administrative feasibility, completely without any segregative desire or aim. Such is not, we think, the position in which the Court in *Keyes* meant to place school officials.

We realize that in many cases the line may be quite thin between action voluntarily taken which foreseeably will not lessen existing de facto segregation and action taken with the purpose of maintaining that segregation. Nonetheless, there is a potential difference in the results either of these standards will allow, and we think it essential that we make clear which standard we follow.

■ To a certain extent, however, this difficulty on the issue of intent and purpose is lessened somewhat in that *Keyes* does not appear to require us to find that segregative intent or purpose was the sole or even the dominant motive underlying the state action in question, but only that such intent or purpose was one of or "among" the factors or motives behind such action. The *Keyes* Court said that if the burden of proof shifted to the defendants,

"Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions." 413 U.S. at 210, 93 S.Ct. at 2698.

While this language deals with the issue of intent where defendants have the burden, we find no indication in *Keyes* that a different standard applies as to plaintiff's burden on the intent issue. We thus hold that whether plaintiff or defendant has the burden on intent at any stage in a particular case, the issue is whether segregative intent or purpose was one of the factors or motives behind the action in question.

■ We note one additional item. One defendant in this case, Unit 12, argues that before a court may find segregation in a school system unconstitutional, the court must find not only segregative intent but also that such intent " . . . was part of a systematic pro-

gram . . . [affecting] . . . a substantial portion of the students, schools, teacher (sic) and facilities within the system." Defendant Unit 12's brief at p. 2.

While we believe this case does involve what would qualify as a "substantial" portion of the county school system here in question, we do not agree with defendant's argument that we need find this in order to find unconstitutional any intentional segregation that might be proven. The language in *Keyes* on which defendant's argument apparently rests occurred in the Court's holding that intentionl segregation proven in the northeast part of the school system shifted the burden of proof to the defendant as to the core city part of the system, since the northeast part involved a substantial portion of the overall system's students, faculty, and resources. This language referred only to this burden of proof issue, and in no way stated or suggested that such substantiality was a requisite for the finding that the segregation in the northeast section was unconstitutional.

■ Indeed, apart from its misreliance on *Keyes*, the proposition defendant argues fails patently on its face. Under defendant's argument, a school board could intentionally create or maintain the most flagrant segregated condition, without fear of constitutional violation, so long as the students and faculty affected did not involve a "substantial" part of the overall school system in question. We think this proposition contradicts not only *Keyes* but also the entire line of school segregation cases from *Brown I* on. If we find an intentional segregated condition in any of the challenged units in this case, we must hold that segregation unconstitutional, regardless of whether or not the segregated students constitute a substantial or significant portion of the overall county student population.

■ In summary, therefore, we read *Keyes* to require three findings before we may find unconstitutional segrega-tion in a school system where segregation is not expressly mandated or permitted by law. First, we must find a condition of "segregation" within the school system. Second, we must find that state action created or contributed to this condition. Third, and most important, we must find that this state action was taken with segregative intent.

■ If these are the issues, the question becomes who has the burden of proof on them. *Keyes* clearly held the burden of proof initially lies with the plaintiff, 413 U.S. at 198, 93 S.Ct. 2686, but the more difficult question is whether and at what point this burden may shift to the defendant.

As already noted above, *Keyes* held that because the plaintiffs there had proved intentional segregation in a meaningful portion of the Denver school system, the burden of proof shifted to the defendant as to the rest of the system. As the Court said,

"(W)e hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." 413 U.S. at 208, 93 S.Ct. at 2697.

Given the facts of *Keyes*, this holding is clear enough, but the rationale on which the Court reached this conclusion and holding is less clear. The above-quoted language lends itself to two different interpretations of the Court's rationale.

The first is that the burden of proof shifted because of the special probative value, insofar as the issue of segregation in part of a school system is concerned, of a finding of intentional seg-

regation in another, significant part of that system. In effect, this rationale would shift the burden of proof only in cases where such a finding had occurred concerning a significant part or all of the school system in question.

The second interpretation of the Court's rationale, however, is that the burden shifted because the finding of intentional segregation in one substantial part of the system established a prima facie case as to whether intent underlay segregation in any other part of that same system. Under this interpretation, the emphasis falls upon the concept of a prima facie case, rather than the particular means by which it is established in a given case. While a finding of intentional segregation in another part of the system in question is one way to establish such a case, it is not necessarily the only way. Such rationale would dictate that regardless of the means or evidence by which a plaintiff establishes a prima facie case, once he has established such case the burden of proof shifts as readily as it did in *Keyes*.

This difference in rationales has obvious importance for this or any similar case. If the burden of proof does not shift absent a finding of intentional segregation in some other meaningful portion of the school system in question, then plaintiffs here must retain the burden throughout the entire case, or at least until we should find intentional segregation in at least one of the units here in question. In such case, if the unit or units in which we found intentional segregation comprised a significant part of the overall county school system, then the burden would shift to defendants as to the constitutionality of segregation in the other challenged units.

Under the second of the above rationales, however, the burden as to any unit would shift once plaintiff establishes a prima facie case of intent as to that unit.

An examination of the entire *Keyes* opinion leads us to conclude that the first of the above rationales more accurately captures what the *Keyes* Court meant in shifting the burden in that case. The Court felt a high probability existed that a school board's segregative intent towards one meaningful part of a school system would find its way into school board actions towards another part of that system. The Court accordingly felt that such probability justified shifting the burden of proof as to any segregation in the latter part of the system. 413 U.S. at 208, 93 S.Ct. 2686. The Court's holding and rationale thus appears to express the Court's view on the burden of proof only under the facts of *Keyes* or a similar case, rather than to establish a principle as to prima facie cases and burdens of proof in school segregation cases in general.

On the other hand, while *Keyes* does not necessarily suggest the burden of proof shifts once the plaintiff establishes a prima facie case, neither does *Keyes* prohibit or preclude such a rule. *Keyes* simply did not deal with this issue. Reference to other cases brought under 42 U.S.C. §§ 1981 and 1983, even though perhaps not involving school segregation, indicate that such a rule might be proper.

A number of these cases hold that the burden shifts to the defendant once the plaintiff has established a prima facie case under the standard of liability governing the action. See, e.g.; Bridgeport Guardians, Inc., v. Members of Bridgeport Civil Service Commission, 482 F.2d 1333 (2d Cir. 1973), which held that where plaintiffs established a prima facie case of discrimination with respect to a policeman's written examination, the defendants had the burden of establishing the justification for its utilization; Officers for Justice v. Civil Service Commission of City and County of San Francisco, 371 F.Supp. 1328 (D.C. Cal.1973), holding that plaintiffs' prima facie showing of de facto discrimination as to the city's procedures for hiring policemen shifted to the city the burden of

justifying the use of the procedures; Bush v. Kaim, 297 F.Supp. 151 (D.C. Ohio 1969), which held that once the plaintiff has made out a prima facie case of racial discrimination in the rental of property, the owner must come forward and show there were other factors responsible for his decision not to rent to the plaintiff.

Before we attempt to decide, however, whether a prima facie showing by plaintiffs should shift the burden of proof in this case, we turn to whether plaintiffs here established such a prima facie showing on the necessary elements of their case.

We consider first whether plaintiffs have shown a "segregated condition" with respect to each of the units, 4, 5, and 12, challenged in this case. Plaintiffs claim not that segregation exists among the schools within any one of these units, but rather that the unit as a whole, because of its internal black student population, presents a segregated condition vis-a-vis neighboring units and the rest of the county. We thus examine this contention for its merit.

Initially, the question arises as to what is meant by the "segregated condition" the Court has said the Constitution forbids states intentionally to maintain in public schools. Less than a year ago, in its most recent school segregation decision, the Court said:

"The target of the *Brown* holding was clear and forthright: the elimination of state mandated or deliberately maintained dual school systems with certain schools for Negro pupils and others for White pupils." Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974).

■ Putting aside for the moment the issue of whether a condition was intentionally or deliberately maintained, we think the above language from *Milliken* and the entire line of the Court's school segregation decisions established that a school district has a segregated condition if the district has a racial identity which contrasts with other or neighboring districts within the school system in question.

Whether a district has this identity will turn on a number of factors. In *Keyes*, the Court in remanding declined to rule on the district court's assumption that a district must have a minority student population of at least 70–75% to qualify as segregated, and instead simply said:

"What is or is not a segregated school will necessarily depend on the facts of each particular case. In addition to the racial and ethnic composition of a school's student body, other factors, such as the racial and ethnic composition of faculty and staff and the community and administration attitudes toward the school, must be taken into consideration." 413 U.S. at 196, 93 S.Ct. at 2691.

■ With these principles in mind, we find that of the three units challenged in this case, plaintiffs have established a prima facie case of a segregated condition only with respect to Unit 12. Plaintiffs' evidence showed that as of the 1968 reorganization, Unit 12 contained a student population 64.4% black, while the four units surrounding it contained student populations respectively only 0% (Unit 14), 2.9% (Unit 7), 5.5% (Unit 11), and 8.1% (Unit 13) black, and the student population of the overall county was only 12.9% black.

In addition, the full-time professional staff of Unit 12 as of the 1968 reorganization was 39.2% black, while that of the county was only 7.7% black, and the comparable measures for the units contiguous to Unit 12 ranged from 0% (Unit 14) to 4.3% (Unit 13).

Moreover, Unit 12 contained as of 1968 68.2% of the county's total black student population, and had by far the highest black percentage of its total student body not only for all units in the county but for all school units or districts in the state.

We believe such evidence quite reasonably establishes, as both plaintiffs' experts Richard B. Anliot and Dr. J. W. Strickler testified without challenge, that Unit 12 is a predominantly minority, racially identifiable school unit, and that such a unit presents the type of condition which the law, under the principles set forth above, considers segregated.

We cannot say the same for Units 4 and 5. Plaintiffs evidence showed that as of the 1968 reorganization, the student bodies of these units were respectively only 16% and 19.8% black. By 1972, the figure for Unit 4 had decreased to 12.6%.

■ Without more, we believe this evidence not only fails to establish a prima facie case that these units constituted segregated school conditions, but in fact establishes a prima facie case for the opposite conclusion. While we do not attempt to intimate whether the minority percentage of a school unit's total student population must meet a certain percentage level before we may call that unit a segregated condition, we simply cannot conclude that such a condition exists in school units respectively only 16% and 19.8% black.

We readily recognize, as plaintiffs evidence showed, that the black student populations of Units 4 and 5 exceeded the black student populations of the other units respectively contiguous to Units 4 or 5. Unit 3, contiguous to Unit 4, had a student population only .1% black in 1968, while Units 7 and 6, contiguous to Unit 5, had student populations respectively 2.9% and .3% black.

We recognize as well that the staff of Units 4 and 5 had somewhat higher black percentages than the staffs of contiguous units in 1968. While the staffs of Units 4 and 5 in 1968 were respectively 20.5% and 5.3% black, those of Units 3, 6, and 7 were respectively .7%, 0%, and .3% black.

■ These figures, however, do not change our conclusions. Mere variance in minority populations among schools does not make the school with the higher percentage segregated. As the Court itself has said:

"The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971).

As this language indicates, the Court said this is a case where the issue was the plan by which the school board had proposed to remedy the unconstitutional segregation which had been found in the district. If mere statistical variation does not establish segregation after a violation has been found, it stands to reason that such variation has no more significance in the determination in the first instance of whether a segregated condition exists.

We emphasize again, however, that our conclusion that Units 4 and 5 do not present segregated conditions rests principally upon the simple fact that, whatever the respective black populations of these units compared to contiguous units, the student bodies of Units 4 and 5 were as of 1968, and remain today, overwhelmingly white.

Having concluded that plaintiffs established that only Unit 12 presents a segregated condition, we turn to the second issue plaintiffs must establish, that of a casual connection between the segregated condition and state action. In *Keyes,* the Court held that such casual connection existed in the state action had "create(d) or contribute(d)" to the segregated condition. 413 U.S. at 211, 93 S.Ct. 2686. While this language which we cite dealt with the Court's statement of the defendant's burden if the burden shifted from the plaintiff, we have no reason to conclude that a different standard applies while the plaintiff has the burden on the issue.

■ We find no problem with concluding that state action did create or

contribute to the segregated condition of Unit 12. The formation of Unit 12 resulted from a decision made by the Delaware County Board of School Directors and approved by the State Board of Education. Whether we consider only the action of the County Board, acting pursuant to a state mandate to reorganize the county's school districts, or only the action of the state board, authorized by the same mandate to approve or disapprove plans submitted by the county boards, or whether we consider cumulatively the actions of both the County and State Boards, state action clearly exists in this case.

We recognize that neither the County nor State Board caused the black residential concentration in Chester City and Township. We also assume arguendo, especially since the record contains no evidence to the contrary, that no other state action caused this residential concentration. We recognize as well that Unit 12 resulted from a combination of established pre-existing, contiguous school districts, rather than any gerrymandering process by either the County or State Boards.

It nonetheless remains true, however, that residential concentration and school attendance need not coincide. Whatever the residential concentration of blacks in the Chester area, it was the decision of the County and State Boards, and only their decision, which determined the schools the black students would attend. The County and State Boards, and only these boards, determined that Unit 12 would include the school districts of Chester City, Chester Township and Upland. In a very real sense, therefore, these boards determined that Unit 12 would contain a black student population to the extent of constituting, as we have held above, a segregated condition. We thus find inescapable the conclusion that the state action which brought the unit into existence created or contributed to its having the segregated condition it contained.

We thus come to the crucial issue of this case, whether plaintiffs' evidence established a prima facie case that when the County or State Board created Unit 12, they did so with the intent to contain the black students in the Chester City and Township area in Unit 12, rather than have them attend school in other units. If proved, this intent would constitute the segregative intent which violates the Constitution.

■ We note preliminarily the sense in which we use the concept of plaintiffs' establishing a prima facie case. As *Wigmore* notes, there are two senses in which courts use this concept. The first is in the sense of a plaintiff's producing evidence sufficient to render reasonable a conclusion in favor of the allegation he asserts. In the common instance of this use of the concept, it means plaintiff's evidence is sufficient to allow his case to go to the jury.

In the second sense of the concept, however, courts use "prima facie" to mean not only that plaintiff's evidence would reasonably allow the conclusion plaintiff seeks, but also that plaintiff's evidence compels such a conclusion if the defendant produces no evidence to rebut it. Wigmore on Evidence, Vol. 9, § 2494 (1940).

In turn, this latter sense of the concept of prima facie case has been refined further, so that the plaintiff's evidence not only compels defendant to produce evidence on the issue in question, but also shifts the burden of proof to the defendant on this issue. In other words, the plaintiff's evidence establishes a presumption in favor of his contention on the issue, and shifts the risk of non-persuasion on the issue to the defendant.

It was this last sense of prima facie case which the Court adopted in *Keyes*. Plaintiffs' evidence, the Court said,

" . . . creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima

facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are *not also the result of intentionally segregative actions.*" 413 U.S. at 208, 93 S.Ct. at 2697.

It is this *Keyes* sense of a prima facie case which we use in the instant action, and applying this sense of a prima facie case to plaintiffs' evidence, we do not feel this evidence establishes a prima facie case on the issue of segregative intent. Viewing plaintiffs' evidence, and adopting all inferences from such evidence favorable to the plaintiff, we would hold that such evidence might reasonably allow the conclusion that segregative intent did play a part in the creation of Unit 12, but we do not believe plaintiffs' evidence is sufficient to create the presumption that such intent existed and shift the burden on this issue to the defendants.

Viewed in its entirety, plaintiffs' evidence showed essentially that:

(1) the defendant school boards in 1968 knew both that the student populations of the Chester City and Chester Township School Districts were respectively 68% and 62% black, although the population of Chester Township had become predominantly and increasingly white;

(2) the defendant school boards knew that combining the Chester City and Township Districts would produce a unit roughly 64% black;

(3) the Chester City school officials, who desired that the Chester City district not be merged with any other district, and especially not with Unit 11, opposed merger with the Chester Township district on racial and financial grounds;

(4) the State Human Relations Commission had through its counsel apparently expressed reservations about the proposed merger of the Chester City and Township districts at a meeting of the Delaware County Board of School Directors, but the Commission subsequently expressed no further reservations to the county board or anyone else;

(5) the Delaware County Board had studied somewhat the possibility of alternative reorganization plans involving the Chester City and Township Districts.

(6) The Delaware County Board was aware of state policy against fostering segregation in public schools;

(7) the defendant school boards adopted the reorganization plan combining the Chester City and Township districts.

(8) the units contiguous to Chester City and Township had student populations between 0% and 8% black.

While we do not reach this conclusion lightly, we nevertheless do not believe this evidence compels the conclusion and evidentiary presumption that in merging the Chester City and Township districts the county or state board acted with segregative intent.

Our principal hesitation against holding that plaintiffs' evidence established a prima facie case on intent stems from the complete absence of any evidence whatsoever of the feasibility of alternative reorganization plans for the component districts of Unit 12. We feel that such evidence is necessary before we may infer segregative intent in this case because of the nature of the evidence that was offered by plaintiffs.

We have in this case no direct evidence of segregative intent, and only circumstantial evidence of a limited extent. We have, for example, no evidence of a pattern of segregated school conditions, or even a gerrymandering effort to achieve Unit 12.

Instead we have evidence only that the county and state boards in fulfilling a state mandate to consolidate county school districts, joined two previously existing contiguous school districts whose students had traditionally attend-

ed high school together, and that in taking such action the boards were aware of the black student concentration the resulting unit would contain.

From this evidence, we are asked to infer or conclude to the extent of an evidentiary presumption that the boards acted with segregative intent or purpose. This we do not believe we can reasonably do. Certainly the concentration of black students in the Chester area into one school unit was a consequence of the boards' actions, and certainly the boards foresaw the consequence. Knowledge of consequences, however, and intent are two different matters. Similarly, permissible inference and a presumption are different. While the boards' adoption of Unit 12 may raise a question in our minds as to their intent, and while this evidence might even permit an inference of segregative intent, before we reasonably conclude or presume from the fact of this choice alone that the boards acted with segregative intent or purpose we feel we simply must have some evidence that the boards had feasible alternatives available.

As it is, however, plaintiffs offered no evidence of feasible alternatives. Plaintiffs' witness Dr. Strickler suggested some possible alternative groupings of the component districts of Unit 12, but derived his suggestions only from a map of the county and statistics as to population, without any consideration at all of factors relevant to the economic and administrative feasibility of his suggested alternatives.

Dr. Strickler himself recognized the limited value of his testimony, and repeatedly emphasized that his suggested alternatives were offered only for possible consideration, and not as recommendations. To make recommendations, Dr. Strickler emphasized, he would need more information than mere population statistics or maps. In so many words, Dr. Strickler thus acknowledged that he had no idea of the feasibility of the alternatives he suggested.

The only other evidence plaintiffs offered on the issue of feasibility was a conclusory statement by Mr. Richard Anliot of the Pennsylvania Human Relations Commission, who said simply that he thought alternative reorganization plans were available. Offered without any explanation of the basis for this conclusion, this testimony stands with little, if any, probative value.

With the testimony of Dr. Strickler and Mr. Anliot the only evidence offered by plaintiffs on the issue of alternatives, we find ourselves not only with no direct evidence from plaintiffs that feasible alternatives existed, but also no circumstantial evidence from which we might draw our own conclusions on the feasibility issue.

We have no basis for knowing, for example, what the area or distance of those alternatives would have been relative to those of the plan chosen. Nor do we know the travel times that such plans would have involved for the students affected compared to their present travel times.

Nor do we know, in addition, the resources the alternative units would have had, or whether the alternative plans would have necessitated higher taxes for the residents of areas involved. We do not know, for example, whether doubling the size of a school unit merely doubles the financial resources required to operate the unit, or whether the financial resources required to operate the unit, or whether the financial burdens instead increase more in geometrical fashion.

In short, plaintiff gave us no basis at all to conclude that when the county and state boards created Unit 12, they did so despite the availability of feasible alternative plans that would have afforded less segregated schools for the students now in Unit 12.

We do not mean to suggest at all that plaintiffs should have treated the issue of feasibility exhaustively, or even that any particular quantum of evidence on feasibility would be required. We rec-

ognize that the evidence relevant to feasibility lies most readily with defendants in a case of this type, and we would perhaps hold, for example, that once a plaintiff produces some evidence on the feasibility issue, the burden of proof on such issue falls to the defendant.

In this case, however, plaintiffs failed, for example, even to ask Mr. Clyde Dalton, the Superintendent of Schools in Delaware County when the 1968 reorganization plan was adopted and currently the Executive Director of the body in charge of the county's schools, why the county board had not adopted the alternative grouping of Chester Township set forth in the study the board had compiled, plaintiffs' exhibit 14. Nor did plaintiffs ask Mr. Dalton whether it would not have been as feasible to adopt any of the reorganization plans that Dr. Strickler later suggested in his testimony, or for that matter any reorganization plan that would have produced a lesser black student population than Unit 12 involved.

We emphasize that our holding here is not meant to suggest that evidence of feasibility is necessarily an essential prima facie element of the plaintiff's case in every school segregation action. The Supreme Court has said what those elements are, and we would not presume to add to them.

We hold instead only that on the facts of this particular case, in order to establish a presumption and prima facie case of segregative intent, and thus shift the burden of proof to the defendant, some evidence that feasible alternatives were available was required of the plaintiff.

We do not think our conclusion unreasonable as a matter either of fact or law. Certainly the evidence offered by plaintiff here palls in comparison with the basis on which the Court in *Keyes* held plaintiffs entitled to a presumption which shifted the burden of proof. There the Court held proper a presumption of segregative intent as to the schools in question because the district court had already found intentional seg-

regation by the defendant school authorities in another substantial section of the school system in question. We recognize that the district court in *Keyes* had made its finding of intentional segregation in part from the fact that, similar to the circumstances of our case, the Denver School authorities had knowingly located a new elementary school in an area which they knew would render the school's student populace virtually all black. This, however, was only one basis for the district court's conclusion. The complete basis on which that court found intent included, among other things, evidence that school officials had gerrymandered student attendance zones, excessively used so-called "optional zones" and mobile classroom units, and that following election of a school board majority opposed to resolutions passed by the predecessor board less than one year earlier to desegregate schools in the area, the new board had promptly rescinded the resolutions. 303 F.Supp. 279 (D.C. Colo.1969). Such evidence of segregative intent bears no comparison to the alleged evidence of intent in our case.

We find a similar lack of comparison in the evidence which supported a presumption and ultimate finding of segregative intent in United States v. School District 151 of Cook County, Ill., 301 F. Supp. 201 (N.D.Ill.1969), and Davis v. School District of City of Pontiac, Michigan, 309 F.Supp. 734 (E.D.Mich.1970), aff'd 443 F.2d 573 (6th Cir. 1971), both of which the Supreme Court cited in *Keyes* with implied approval on the issue of presumptions and a shift in the burden of proof.

In *School District 151*, the district court had drawn a presumption and ultimate finding of segregative intent from evidence of, among other things: all schools within the system being either virtually all-white or all-black; deliberate employment and assignment of faculty on the basis of race; busing and assignment of white students to all-white schools instead of increasingly black schools nearer their homes; de-

liberate location and construction of schools which promoted continued segregation rather than integration; deliberate tailoring by the school board of all its decisions and actions to accommodate anti-integration sentiment among the majority, white public, including the rescinding of attendance measures the board agreed would permit curriculum improvements, but which would have also resulted in integration. 301 F.Supp. at 208–216.

In *Davis*, the court drew its presumption and finding of segregative intent from, among other things, a clear pattern of location and construction of schools to preserve the all-white or all black character of the city's schools, and a racial composition of faculty which corresponded in each school to the racial composition of the student body. 309 F.Supp. 740–743.

In each of the above cases, we would note that although evidence existed sufficient to establish a presumption of segregative intent independent of any evidence that the school authorities had feasible alternatives to the actions they took, such evidence of feasible alternatives usually existed as well. The adoption by a school board, for example, as in *Keyes*, of a resolution to implement action promoting integration, indicates the board had a feasible alternative to the action it ultimately took after it summarily rescinded the resolution.

Nor does our holding conflict with principles governing the establishment of prima facie cases in other types of actions brought, as is this case, under 42 U.S.C. § 1983. While in Thomas v. Pate, 493 F.2d 151 (7th Cir. 1974), the court held a prima facie case shifting the burden of proof was established merely by showing virtually complete separation of inmates according to race in the cells of the plaintiffs' prison, without evidence of segregative intent, the court itself expressly distinguished that case from school segregation cases. First of all, the court said, while *Keyes* clearly required a showing of segrega-

tive intent to establish a prima facie case in a school segregation action, the court felt no such requirement applied to an action involving alleged segregation in prisons. Secondly, the court said, even if evidence of segregative intent were necessary to establish a prima facie case in the prison segregation context,

> "In the prison context, as contrasted with the public schools, we think there is a higher probability that a pervasive pattern of racial separation in cell occupancy is attributable to intentionally segregative actions . . . ." 493 F.2d at 156.

Without belaboring the point further, any of several points distinguish our case from any other in which a plaintiff has established a prima facie case by merely showing, as plaintiff has shown here, that the defendant knowingly took action which had a segregative impact. First, where such evidence by itself establishes the prima facie case, the standard of liability, unlike that in our case, does not require proof of segregative intent. Where the standard of liability does require proof of such intent, mere proof of action taken with foreseeable segregative effect will in the vast majority of cases not by itself establish a presumption of segregative intent, but instead must be accompanied by other evidence indicative of such intent. In the unusual instance where proof of such action taken with foreseeable segregative effect alone establishes the prima facie case, the action was most likely taken in circumstances or an environment rendering such action especially probative of segregative intent.

We thus conclude that even if a prima facie case of segregative intent would shift the burden of proof to defendant in this case, plaintiffs have not established such a prima facie case, and the burden of persuasion thus remains plaintiffs'.

We turn, therefore, to whether plaintiffs carried this burden of proof, by showing by a preponderance of the

evidence that segregative intent played a part in the creation of Unit 12. We have already outlined plaintiffs' evidence. Defendants' evidence, in its salient aspects, consisted essentially of:

(1) testimony by Mr. Dalton that the Delaware County School Board had, under the reorganization prior to that of 1968:

(a) merged Media's district, with a student population roughly 15% black with three other districts with virtually no black student population;

(b) merged Upper Chichester, with a student population only 8% black but containing 900 black students, with three other districts containing only 250 black students and 9000 students total, to form Unit 13, with an 8% black student population.

(2) the testimony of Mr. Dalton that the county board had under the 1968 reorganization:

(a) combined the Morton District, with a student population 27% black (of a .1% total student population), to form Unit 8, with a 4% black student population.

(b) combined the Nether-Providence District, with 715 blacks, or a total student population 5% black, with three other districts containing cumulatively 230 blacks and only 8000 students overall, to form Unit 11, with a student population 5.5% black.

(3) Mr. Dalton's testimony that Chester Township and City had been combined because:

(a) Chester Township students had historically attended Chester City for high school purposes, and had successfully gone to court to enforce their interest in such attendance;

(b) there were financial concerns with respect to the placement of the Chester Township District, in that while Chester City was by no means

wealthy, the other districts contiguous to Chester Township, namely, Upper Chichester (Unit 13) and Penn-Delco (Unit 14), had lower market values of taxable real estate per student than Chester City;

(c) the board chose not to merge Chester City with any of the larger districts or units contiguous to Chester because the board felt the need was not to help the city of Chester by enlarging it with other districts, but to help the districts adjacent to Chester.

(4) the testimony of Mr. Dalton and Mr. Vaul, Superintendent of Schools in Unit 12, that in their respective opinions the education the students received in that unit was a "quality" education and met state standards.

(5) the testimony of Mr. Smith, Assistant Superintendent for Unit 12, that desegregation had occurred for most schools within Unit 12, and that the problem was being worked out for the remaining schools.

Viewing all the evidence from both sides, and having heard the testimony of the witnesses, we conclude that plaintiffs have not proved to us that the county and state boards more likely than not acted with segregative intent in merging Chester City and Township.

We do not say that defendants convinced us that segregative intent was not involved in any way in the decision of the boards, especially at the county level. We say only that having viewed and heard all evidence and testimony, we are left with doubts, unanswered by either side, on the intent issue.

Mr. Dalton testified, for example, that Chester Township was merged with Chester City partially for financial reasons, in that Chester City had a higher market value per student ratio than the other districts contiguous to Chester Township. On cross-examination plaintiffs showed that the merger of Chester City and Township produced a unit with the lowest market value per student of

all county units. Yet, on the other hand, no one showed that the same result would not have occurred had the board placed Chester Township with either of the contiguous districts other than Chester City. That is, we do not know whether, because of Chester Township's own market value per student, a merger of the township with either the Penn-Delco or Upper Chichester districts would not have made such resulting unit, rather than the present Unit 12, the unit with the lowest market value per student in the county, with perhaps an even lower ratio in this regard than Unit 12 now has.

Given the facts of this case, proof that feasible alternatives did exist would likely persuade us segregative intent more likely than not did play a part in the boards' decisions. On the other hand, proof that such feasible alternatives did not exist would likely persuade us against finding segregative intent. In this case, however, we have no real evidence on the issue of feasibility one way or the other.

Given the evidence that does exist in the case, we can only conclude that our decision must go to the defendants. Plaintiffs brought this case claiming that the defendants had unconstitutionally created a segregated school condition in the Chester City and Township area. The law requires both that plaintiffs prove this claim, and that to prove it, they must under *Keyes* show that defendants, in causing the segregated condition complained of, acted with segregative intent. But, plaintiffs' evidence showed only that defendants, ordered by the state legislature to consolidate school districts in Delaware County, formally joined two districts with a previous, long-standing working relationship, although defendants were aware that the unit thus formed would have a majority black student population while surrounding units were for the most part white. Other parts of plaintiffs' evidence, however, as well as defendants' evidence, showed that one of these districts, Chester Township approved the merger, and while the other district, Chester City, not wanting merger with anyone, raised racial objections to it, the merger in fact produced a less segregated school condition for the city's students than if the city had been granted its wish and left a unit by itself.

Moreover, not only did plaintiff fail to show the defendants created segregated conditions elsewhere in the county, defendants' evidence showed they had in a number of instances, both prior to and in the 1968 reorganization, readily joined districts with sizeable black student populations, either in percentage or absolute number, with districts virtually all white.

Finally, plaintiffs' evidence itself indicated that any alternative grouping of Chester City which would significantly have reduced the segregation in that city would necessarily have involved forming a unit substantially larger than the present Unit 12, which is already the second largest unit in the county and significantly larger than all but the county's largest unit. We find it reasonable, as defendants' witness Mr. Dalton testified, that the county board would hesitate to create such a unit. The potential size of such a unit alone raises in our minds questions as to the economic and administrative problems such a unit would pose.

In short, on such a record, before we could infer that the boards acted with segregative intent in merging Chester City and Township, we would need evidence that the boards could reasonably have acted other than they did. As we have no such evidence, plaintiffs' claim on the segregation issue must fail.

*The Economic Discrimination Claims.*

In their second cause of action, plaintiffs allege the county and state boards, in creating Units 4, 5, and 12, created units which do not have the economic capacity nor educational resources to provide an educational program commensurate with those of the adjoining units,

and that such action thus violated the Fourteenth Amendment to the United States Constitution.

In their third cause of action, plaintiffs allege that the Interim Operating Committees for Units 4, 5, and 12, by proposing a uniform tax millage rate to apply throughout each unit despite the fact that assessment ratios are unequal as applied in the component school districts are unequal, have thus burdened plaintiffs with an arbitrary, discriminatory and unreasonable tax in violation of the Fourteenth Amendment.

We find no merit in either contention. In San Antonio School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L. Ed.2d 16 (1973), plaintiffs challenged on Fourteenth Amendment grounds the Texas statutory system of school taxation, which authorized an ad valorem tax by each school district on property within the district to supplement educational funds received by each district from the state and which thus resulted in substantial interdistrict disparities in per-pupil expenditures, attributable chiefly to the differences in amounts received through local property taxation because of variations in the amount of taxable property within each district. A three-judge court held the system discriminated on the basis of wealth and was thus unconstitutional under the equal protection clause.

As we noted in our opinion of May 22, 1973, in reversing the three-judge court, the Court reasoned that the state's tax system, despite its imperfections, rationally furthered a legitimate state purpose, and thus did not violate the equal protection clause. The system, the Court stated, by its provision for state contributions to each district, assured a basic education for every child, while permitting and encouraging vital local participation and control of schools. Since the system, similar to systems employed in virtually every other state, was not the product of purposeful discrimination against any class, but was rather a responsible attempt to arrive at practical and workable solutions to education systems, it did not violate the 14th Amendment.

█ In our opinion and order of May 22, 1973, we held Rodriguez disposed of plaintiffs' fourth cause of action, and upon further consideration, we think Rodriguez disposes as well of plaintiffs' second cause of action. We have no evidence whatsoever that the 1968 Reorganization Plan in Delaware County was adopted with the purpose of discriminating economically against the residents of Units 4, 5, or 12, and whether or not these units have different economic capacities than surrounding units, the reorganization plan clearly is rationally related to the legitimate state interests which the Rodriguez Court noted, among others the state's interest in providing responsibly and practically for a basic education for every child while encouraging local control of schools.

█ We think as well upon further consideration that Rodriguez renders unnecessary any referral of plaintiffs' third cause of action to a three judge court, as we had said we would do in our opinion of May 22, 1973. Plaintiffs claim in this cause of action that the use of uniform tax millage rates throughout Units 4, 5, and 12 discriminates unconstitutionally because of different assessment ratios which exist in the various component districts of these units. Since we find no evidence of purposeful economic discrimination against residents of Units 4, 5, or 12, by county and state officials in adopting the reorganization plan, and since as noted above the plan is rationally related to legitimate state educational interests, this cause of action contains no substantial claim of unconstitutionality, even if the facts as plaintiffs state them in their complaint are true.

## CONCLUSIONS OF LAW

Under the principles set forth in the above discussion we reach the following conclusions of law.

1. We have jurisdiction of plaintiffs' claims, brought under 42 U.S.C. § 1983, under 28 U.S.C. § 1343.

2. Plaintiffs, although white, have standing to assert their first cause of action, alleging unconstitutional racial discrimination.

3. Unit 12 in Delaware County contains a segrated condition, but Units 4 and 5 do not.

4. The segregated condition within Unit 12 was created or contributed to by state action, in this case the action of the Delaware County Board of School Directors and the State Board of Education in joining Chester City and Township to form Unit 12.

5. Plaintiffs failed to establish a prima facie case that the county and state boards acted with segregative intent in forming Unit 12, and thus the burden of proof remained with the plaintiff.

6. Because plaintiffs failed to prove by a preponderance of the evidence that the county and state boards acted with segregative intent, plaintiffs have failed to establish that the formation of Unit 12 violated the Fourteenth Amendment to the United States Constitution.

7. The state interests which both the formation of Units 4, 5, and 12 and the tax systems within each unit rationally serve, namely, providing a basic education for every child, permitting and encouraging local participation and control of schools, and attempting to arrive at practical and workable solutions to educational problems, are legitimate state interests.

8. Because the formation of Units 4, 5, and 12 resulted from no purpose to discriminate economically against any class, and because the formation of these units bears a rational relationship to legitimate state interests, the formation of Units 4, 5, and 12 did not violate the Fourteenth Amendment to the United States Constitution.

9. Because the tax millage systems adopted by the Interim Operating Committees of Units 4, 5, and 12 do not result from any purpose to discriminate economically against any class, and because the systems are rationally related to legitimate state interests, plaintiffs' third cause of action does not allege a substantial claim of unconstitutionality as to these tax systems, and it is thus unnecessary to refer this cause of action to a three judge court.